UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JANET MAVIS MARCUSSE,

       Movant,

                                 File No. 1:09-CV-913

v.

                                 HON. ROBERT HOLMES BELL

UNITED STATES OF AMERICA,

       Respondent.

_____/

## O P I N I O N

This matter is before the Court on Movant Janet Marcusse's motion to vacate, set aside, or correct her sentence pursuant to 28 U.S.C. § 2255. (Dkt. No. 1.)[1] Movant was indicted on October 27, 2004, on the following charges: (1) mail fraud, in violation of 18 U.S.C. § 1341; (2) conspiracy to commit mail fraud, in violation of 18 U.S.C. § 371; (3) conspiracy to commit money laundering, in violation of 18 U.S.C. § 371; (4) conspiracy to defraud the United States, in violation of 18 U.S.C. § 371; and (5) money laundering, in violation of 18 U.S.C. § 1956(a)(1)(A)(I). (1:04-CR-165, Dkt. No. 108, Superseding Indictment.) Movant was convicted on June 14, 2005, and sentenced to twenty-five years in prison. (1:04-CR-165, Dkt. Nos. 522, 558.) Movant appealed and her conviction was affirmed on February 19, 2008. (1:04-CR-165, Dkt. No. 704). Movant filed her § 2255

---

[1] All citations to the current case file, 1:09-CV-913, will be cited directly by docket number. All citations to other case files will include the file number.

motion on October 2, 2009.  (Dkt. No. 1.)  On March 30, 2011, this Court conducted a preliminary review pursuant to Rule 4 of the Rules Governing Section 2255 Proceedings. (Dkt. Nos. 41-42.)  Upon review the Court dismissed many of Movant's claims for failing to present a plausible basis for relief and directed the government to respond to the remaining claims.  (*Id.*)

## I.

A prisoner who moves to vacate his sentence under § 2255 must show that the sentence was imposed in violation of the Constitution or laws of the United States, that the court was without jurisdiction to impose such sentence, that the sentence was in excess of the maximum authorized by law, or that it is otherwise subject to collateral attack. 28 U.S.C. § 2255.  To prevail on a § 2255 motion "a petitioner must demonstrate the existence of an error of constitutional magnitude which had a substantial and injurious effect or influence on the guilty plea or the jury's verdict." *Humphress v. United States*, 398 F.3d 855, 858 (6th Cir. 2005) (quoting *Griffin v. United States*, 330 F.3d 733, 736 (6th Cir. 2003)).  Non-constitutional errors are generally outside the scope of § 2255 relief.  *United States v. Cofield*, 233 F.3d 405, 407 (6th Cir. 2000).  A petitioner can prevail on a § 2255 motion alleging non-constitutional error only by establishing a "fundamental defect which inherently results in a complete miscarriage of justice, or, an error so egregious that it amounts to a violation of due process." *Watson v. United States*, 165 F.3d 486, 488 (6th Cir. 1999) (quoting *United States v. Ferguson*, 918 F.2d 627, 630 (6th Cir. 1990) (internal quotations

omitted)).

As a general rule, claims not raised on direct appeal are procedurally defaulted and may not be raised on collateral review unless the petitioner shows either 1) "cause" and "actual prejudice"; or 2) "actual innocence." *Massaro v. United States*, 538 U.S. 500, 504 (2003); *Bousley v. United States*, 523 U.S. 614, 621-22 (1998); *United States v. Frady*, 456 U.S. 152, 167-68 (1982). An ineffective assistance of counsel claim, however, is not subject to the procedural default rule. *Massaro*, 538 U.S. at 504. An ineffective assistance of counsel claim may be raised in a collateral proceeding under § 2255, whether or not the petitioner could have raised the claim on direct appeal. *Id.*

In reviewing a § 2255 motion where factual disputes arise, "the habeas court must hold an evidentiary hearing to determine the truth of the petitioner's claims." *Valentine v. United States*, 488 F.3d 325, 333 (6th Cir. 2007) (quoting *Turner v. United States*, 183 F.3d 474, 477 (6th Cir. 1999)). The Court must grant a hearing to determine the issues and make findings of fact and conclusions of law on a § 2255 motion "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b). No evidentiary hearing is required if the allegations "cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact." *Valentine,* 488 F.3d at 333 (quoting *Arredondo v. United States*, 178 F.3d 778, 782 (6th Cir. 1999)). "If it plainly appears from the motion, any attached exhibits, and the record of prior proceedings that the moving party is not entitled to relief, the judge

must dismiss the motion." Rules Governing § 2255 Cases, Rule 4(b). Where the judge considering the § 2255 motion also conducted the trial, the judge may rely on his or her recollections of the trial. *Blanton v. United States*, 94 F.3d 227, 235 (6th Cir. 1996).

## II.

As listed in this Court's March 30, 2012, order, Movant has 33 remaining claims for collateral relief.[2] Upon review, all of these claims lack merit. The Court will discuss the merits of each, in turn.

### A.  Ground Two: Argument (2)

Marcusse asserts that the Supreme Court's holding in *United States v. Santos*, 553 U.S. 507 (2008) – that "proceeds" under 18 U.S.C. § 1956(a)(1) means "profits" – precludes her conviction on the money laundering counts. (Dkt. No. 30, at 171.) However, this claim was not raised on appeal, and thus is procedurally defaulted unless Marcusse can show cause and prejudice. *Santos* was decided after Marcusse's appeal, giving support to the notion that Marcusse has cause for not raising it on appeal. However, the government correctly notes that this Court found the same *Santos* claim raised by Marcusse's co-defendant, Donald Buffin, to be procedurally barred. (Dkt. No. 59, at 26.) The Court ruled this way because the claim *was* available to be raised on appeal due to a 2002 Seventh Circuit decision finding that "proceeds" meant "profits" and discussion of the matter in the First and Eighth Circuits. (Dkt. No. 1:09-CV-146, Dkt. No. 27, at 8.) For the same reasons, the Court finds that

---

[2]The Court will not address the new claims raised for the first time in Marcusse's reply brief (Dkt. No. 70).

Marcusse's failure to raise the *Santos* claim lacks cause, and thus the claim is procedurally barred.[3]

If this claim was not barred, Marcusse would be entitled to § 2255 relief on some counts of her conviction. Marcusse is correct that *Santos* precludes her conviction as to the counts involving promotion money laundering in violation 18 U.S.C. § 1956(a)(1)(A)(I) (Counts 43-57), a point the government concedes. (Dkt. No. 59, at 28.) However, Movant is incorrect as to the other counts of money laundering (Counts 41, 58, 81-82). But despite her entitlement to collateral relief on some counts if her claim was not procedurally barred, the Court would nonetheless, pursuant to the concurrent sentencing doctrine, deny Marcusse § 2255 relief.

First, the Court will discuss why Marcusse's *Santos* claim has merit for certain money laundering counts, but not others.  In *Santos*, the plurality concluded that because "proceeds" could fairly be interpreted to mean either "profits" or "receipts," to avoid a "merger" problem, the rule of lenity required limiting proceeds to profits, at least insofar as it was applied to an illegal lottery where the government charged promotional money laundering. 553 U.S. at 514-16. The Court explained that interpreting proceeds to mean receipts would mean that every person who operated an illegal lottery would, by default, simultaneously commit promotional money laundering "because paying a winning bettor is a transaction

---

[3]In the disposition of another co-defendant, William Flynn's, § 2255 motion, the government did not argue that the *Santos* claim was procedurally barred. Thus, this Court dismissed the claim on the merits. (1:09-CV-451, Dkt. No. 50, at 34.)

involving receipts that the defendant intends to promote the carrying on of the lottery." *Id.*

The Sixth Circuit has interpreted *Santos* as follows: "[proceeds] means profits *only when the § 1956 predicate offense creates a merger problem* that leads to a radical increase in the statutory maximum sentence and only when nothing in the legislative history suggests that Congress intended such an increase." *United States v. Kratt*, 579 F.3d 558, 562 (6th Cir. 2009) (emphasis added). The Sixth Circuit put it a different way in a later opinion: "[A] merger problem arises when defining 'proceeds' as 'receipts' automatically makes commission of the predicate offense a commission of money laundering and where the predicate offense carries a much lower statutory maximum sentence than the associated money laundering." *United States v. Crosgrove*, 637 F.3d 646, 655 (6th Cir. 2011).

Because there is a merger problem with Counts 43-57, as the government concedes, Marcusse is entitled to collateral relief on those grounds. However, Movant is not entitled to collateral relief for the other money laundering counts (41, 58, 81-82) because those counts do not raise a merger problem. *See Kratt*, 579 F.3d at 562 (requiring a merger problem for *Santos* to apply).

Count 58 regarded transactional money laundering under 18 U.S.C. § 1957. Under this statute, it is a crime to knowingly engage in a monetary transaction in property of a value greater than $10,000 that is derived from a specified unlawful activity. 18 U.S.C. § 1957(a). Here, the specified unlawful activity was mail fraud. (1:04-CR-165, Dkt. No. 108, at 31.) There is no merger problem because the mail fraud, which involved conduct such as mailing

newsletters to investors with false statements and mailing fake interest checks, did not "merge" with Marcusse's use of funds derived from the scheme for the personal expenditure of purchasing a private home for herself on Allegan Lake. *See, e.g., Bush*, 626 F.3d at 538 ("Bush's profligacy is not a basis for weaving money laundering into a Ponzi scheme"); *United States v. Moreland*, 622 F.3d 1147, 1165 (9th Cir. 2010) (finding that counts predicated on conduct that is not "central to the scheme to defraud" do not present *Santos* merger problem). *See also United States v. McCray*, No. 09-CV-0614, 2010 WL 3171210, at *6 (S.D. Cal. Aug. 11, 2010) (rejecting defendant's *Santos* claim, presented in a § 2255 motion, in part on basis that his use of criminally derived funds "to purchase . . . luxury items for himself was clearly not a critical part of the scheme's ongoing existence and thus does not pose a merger problem"). Moreover, such transactions, by their nature, logically involved Movant's share of profits from the scheme. *See United States v. Persaud*, 411 F. App'x 431, 434 (2d Cir. 2011) (finding that "the money laundering transactions in question involved 'profits' from the underlying fraud" where "the jury heard evidence of how the [defendants] used layered financial transactions to purchase personal items such as a car or a home").

The same "non-merger" argument applies equally to Marcusse's convictions for conspiracy to commit money laundering (Count 41) and concealment money laundering (Counts 81 and 82).

However, the fact that Marcusse would be entitled to collateral relief on Counts 43-57

absent the procedural bar does not mean that the Court would be obligated to grant her § 2255 relief.  The "concurrent sentencing doctrine" invests the Court with discretion to decline to hear a substantive challenge to a conviction when the sentence on the challenged conviction is being served concurrently with an equal or longer sentence on a valid conviction.  *See United States v. Ware*, 282 F.3d 902, 906 (6th Cir. 2002); *United States v. Wade*, 266 F.3d 574, 578 (6th Cir. 2001); *United States v. Hughes*, 964 F.2d 536, 541 (6th Cir. 1992); *Dale v. Haeberlin*, 878 F.2d 930, 935 n.3 (6th Cir. 1989).  Applying the principle, the Supreme Court and the Sixth Circuit have declined to review convictions on one count where the presence of a valid concurrent sentence on a different count is sufficient to retain the defendant in custody.  *See, e.g., Hirabayashi v. United States*, 320 U.S. 81, 105 (1943); *United States v. Burkhart*, 529 F.2d 168, 169 (6th Cir. 1976).  The standard guiding the court's discretion is whether there exists any possibility of an adverse "collateral consequence" if the conviction is allowed to stand.  *See Hughes*, 964 F.2d at 541; *Dale*, 878 F.2d at 935 n.3; *see also United States v. Byrd*, No. 89-CV-6448, 1990 WL 116538, at * 3 (6th Cir. Aug. 13, 1990); *Garris v. Curtin*, No. 1:05-CV-209, 2008 WL 680416, at *11 (W.D. Mich. Mar. 7, 2008).

The Court imposed a sentence of 240 months for Count 41, to run concurrently with a sentence of 240 months on each of Counts 43 through 57, and to run concurrently with a 240-month sentence on Counts 81 and 82.  (1:04-CR-165, Dkt. No. 558, at 2.)  Thus, all the money laundering counts carried a 240-month concurrent sentence.  The Court also imposed

concurrent three-year terms of supervised release as to each count.  (*Id.*)  Thus, the sentences are completely concurrent.

However, the Court did assess Marcusse $6,000.  (1:04-CV-165, Dkt. Nos. 639, at 48; 558, at 5.)  In *Ray v. United States*, 481 U.S. 736, 737 (1987) (per curiam), the Supreme Court held that the concurrent sentencing doctrine does not apply where a defendant must pay an assessment on each count of conviction.  Thus, the Sixth Circuit has declined to apply the doctrine in such cases.  *See Ware*, 282 F.3d at 906; *Wade*, 266 F.3d at 579.  Nevertheless, on October 16, 2006, the Court remitted the entire special assessment, eliminating this potential issue.  (1:04-CR-165, Dkt. No. 674.)

Accordingly, because Marcusse's sentences for her money laundering convictions are fully concurrent, the Court would decline to award relief as to the counts of conviction for promotion money laundering (Counts 43-57) pursuant to the concurrent sentencing doctrine, even if it did not find that Movant's claims were procedurally barred.  *See, e.g., United States v. Garcia-Flores*, 136 F. App'x 685, 688 (5th Cir. 2005) (declining to review sufficiency of the evidence challenge to one count, where concurrent sentence was imposed for another valid count of conviction and separate assessments originally imposed for each count had been remitted).

### B. Ground Three: Argument (1)

Marcusse also alleges that Government Trial Exhibits 1, 3, 31, and 33 were altered prior to presentation to the jury in a way that materially prejudiced her.  First, this claim is

procedurally defaulted because Marcusse failed to object to these exhibits at trial.  She claims she was unable to object because she was not permitted to cross-examine witnesses.  (Dkt. No. 34, at 79-80.)  However, this assertion is belied by the record.  Prior to the testimony of the first witness, Marcusse, through her counsel, requested permission to proceed with "hybrid" representation whereby her attorney and she would each conduct direct and cross-examinations of witnesses.  (1:04-CR-165, Dkt. No. 470, at 140.)  In total, Marcusse cross-examined eighteen of the government's witnesses.  (1:04-CR-165, Dkt. No. 473, at 805-11, 857-61; Dkt. No. 474, at 1010-25, 1100-04, 1164-66, 1316-21, 1540-456, 1590-94; Dkt. No. 477, at 1664-83; Dkt. No. 513, at 2038-2123; Dkt. No.515, at 2247-70, 2282-87, 2378-85; Dkt. No. 516, at 2464-65, 2472-75, 2489-95, 2509-14, 2532-36.)  Marcusse points to nothing on the record showing that she was not permitted to cross-examine witnesses at the time the exhibits in question were admitted.  Thus, this argument is procedurally barred.

In any case, Marcusse's complaints about the exhibits lack merit.  With respect to Exhibit 1, Marcusse argues that an "incompetent witness" introduced the exhibit (Dkt. No. 34, at 78), paving the way for the government to put forward a "deceitful theory" that the product it advertised was the only product offered to customers, that it was "irrelevant" to some witness testimony (*id.* at 79-80), and that page numbers were added to it (*id.* at 81). Exhibit 1 was properly admitted during the testimony of one of the victim-investors who said that he saw the exhibit when he first learned about the program, although he did not enroll until much later.  (Dkt. No. 470, at 91-92.)  He testified that Exhibit 1 was a booklet that the

defendants gave him explaining the program.  (*Id.* at 96.)  He also testified that he received

much of the same information conveyed in the exhibit orally from Marcusse, including that

the program was endorsed by the International Chamber of Commerce and the Federal

Reserve (*id.* at 97) and that investment principal would be kept safe (*id.* at 99-100).  He also

recalled signing a non-disclosure agreement similar to the one contained in Exhibit 1.  (*Id.*

at 101-02.)

Many other witnesses testified about having seen the exhibit and its contents.  (*E.g.*,

Dkt. No. 472, at 412-13, 890-91; Dkt. No. 475, at 1197, 1335; Dkt. No. 477, at 1511, 1554.)

At least two of these witnesses testified to having received the exhibit after 1998.  (*See* Dkt.

No. 472, at 412-13; Dkt. No. 475, at 1197-98.)  Marcusse wholly fails to establish that

Exhibit 1 was "irrelevant" or that it was "tampered with."  Moreover, the argument that page

numbers were added to mislead the jury is without merit.  The transcript reflects the fact that

the page numbers were added to facilitate the examination of witnesses regarding the exhibit.

(*See, e.g.*, Dkt. No. 470, at 97 ("I'd like to direct your attention to *what we've identified as*

*Page 6* of this document) (emphasis added).)

Marcusse's complaints about the other exhibits, Exhibits 3, 31, and 33, are likewise

without merit.  Marcusse claims that Exhibit 3 was misleading because at one point it was

attached to Exhibit 33.  But this document was admitted as both an attachment to Exhibit 33

and separately as Exhibit 3, and there was no error in doing so.  She claims that Exhibit 31

is missing attachments, but there is no indication of that in the transcript and, in any event,

she fails to show how this rendered the exhibit misleading or otherwise improper.  Her complaints about Exhibit 33 are similar – that it supposedly is missing attachments – but there is no indication in the transcript that any attachments were "removed."

Moreover, Marcusse has not shown that the admission of the challenged exhibits prejudiced her so as to excuse her procedural default or to establish the sort of "fundamental defect which inherently results in a complete miscarriage of justice" that warrants collateral relief.  *See Hill v. United States*, 368 U.S. 424, 428 (1962).  Throughout the trial, Marcusse pressed her argument that Exhibit 1 was not used during most of the program.  Moreover, she herself used Exhibit 33 in an effort to prove her contention that the Bahamas "CD" Trading Program was the "flagship" investment vehicle and that it was legitimate because it was "stock" based. (Dkt. No. 518, at 3040-46.)  Indeed, the "critical" portion of Exhibit 33 that Marcusse complains was "removed" from the exhibit is on page 2 of the newsletter – not on one of the attachment pages.  (*See* Dkt. No. 34, at 82 ("GX-33, had the jury been allowed to see it, disclosed in regards to 'all funds,' 'This program is not considered to be a standard bank debenture program,' . . . 'We are instead in what is termed a stock trading program.'") (citing page 2 of the exhibit).)  Marcusse cross-examined witnesses about that very language. (*E.g.* Dkt. No. 473, at 804-05; Dkt. No. 477, at 1674-76; Dkt. No. 513, at 2050-51.)  The jury did not accept Marcusse's theory, but she had a full and fair opportunity to present it.

### C. Ground Three: Argument (2)

Marcusse also objects to the failure of defense counsel to object to exhibits.  (Dkt. No.

34, at 83.)   Marcusse has failed to show the necessary factors to establish ineffective assistance of counsel.   To make out such a claim, Marcusse is required to show that: (1) her attorney's representation was objectively unreasonable; and (2) she was prejudiced by this representation.   *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984).   First, her attorney's representation was objectively reasonable.   Her attorney's affidavit demonstrates that his behavior was objectively reasonable.   (*See* Dkt. No. 60, at ¶ 7(KK)-(NN).)   This is especially true in light of the fact that he was acting as Marcusse's stand-by counsel only, meaning that Marcusse could object to the exhibits herself.   (1:04-CR-165, Dkt. No. 213.)   Moreover, as discussed, Movant has made no showing that she was prejudiced by her counsel's failure to object to the exhibits in question.   Thus, her ineffective assistance of counsel claim lacks merit.

### D. Ground Four: Argument (2)

Marcusse argues that joinder with co-defendants Diane and Wesley Boss was improper and unfairly prejudicial.   (Dkt. No. 34, at 95-99.)   This claim is procedurally barred and, in any case, lacks merit.

First, to the extent that Marcusse argues that initial joinder with the Bosses was improper under Federal Rule of Criminal Procedure 8(b), the argument is procedurally defaulted because Marcusse did not move for severance prior to trial nor at any point in the trial proceedings.   Rule 12(b)(5) requires that a defendant move for severance prior to trial or the issue is waived.   Such a motion would have lacked merit in any event.   As a general

rule, parties that are jointly indicted should be tried together, particularly when the indictment charges conspiracy. *United States v. Weiner*, 988 F.2d 629 (6th Cir. 1993). Additionally, joinder is proper where there is overlapping proof. *See United States v. Swift*, 809 F.2d 320, 322 (6th Cir. 1987). Marcusse and the Bosses were charged in three conspiracy counts and all of the proof against them overlapped. Thus, initial joinder was proper.

Second, although Marcusse explicitly addresses misjoinder, the thrust of her argument appears to be that joinder with the Bosses was prejudicial. That argument, too, is procedurally defaulted. Prejudicial joinder is distinct from a claim of misjoinder and should be analyzed under Rule 14. *See United States v. Williams*, 711 F.2d 748, 750 (6th Cir. 1983). Similar to claims of misjoinder, Rule 12(b)(5) requires that motions for severance based upon prejudicial joinder be raised pre-trial. The claim is procedurally barred, as Marcusse failed to raise the issue during the trial proceedings, and has thus waived the issue. *See United States v. Beaver*, No. 97-2224, 2000 WL 491538, at *2 (6th Cir. April 20, 2000). She has not shown good cause for her failure to raise the issue, and pointing to the Bosses' motion for severance does not retrospectively preserve the motion on her part. *See United States v. Ghazaleh*, 58 F.3d 240, 243 (6th Cir. 1995).

Even if the issue were not procedurally barred, it lacks merit. Strong public policy favors joinder, and therefore severance is appropriate only where the trial rights of the defendant are implicated, or where joinder would "prevent the jury from making a reliable judgment about guilt or innocence." *United States v. Breinig*, 70 F.3d 850, 853 (6th Cir.

1995) (quoting *Zafiro v. United States*, 506 U.S. 534, 539 (1993)).  The jury is presumed to be capable of sifting through evidence and considering the cases of each defendant separately.  *United States v. Cobleigh*, 75 F.3d 242, 248 (6th Cir. 1996) (citing *United States v. Moore*, 917 F.2d 215, 222 (6th Cir. 1990)).  It is the defendant's burden to show that there was specific and compelling prejudice that might confuse the jury.  *Id.*  Marcusse's argument that testimony concerning the Bosses' spending practices created a risk of "spillover prejudice" lacks merit because allegations of spillover prejudice are inadequate to show that jury confusion occurred.  *See, e.g., United States v. Medina*, 992 F.2d 573, (6th Cir. 1993); *Swift*, 809 F.2d at 323.

Finally, Marcusse posits that she was prejudiced when the Bosses pleaded guilty mid-trial.  The Sixth Circuit has held that mid-trial guilty pleas do not present the requisite level of prejudice.  *United States v. Dean*, 861 F.2d 722 (6th Cir. 1988) (mistrial is not warranted when a co-defendant pleads guilty and testifies); *United States v. Bavers*, 787 F.2d 1022 (6th Cir. 1985) (severance is not warranted when a co-defendant pleads mid-trial and delivers damaging testimony).  The jury in this case was never told that the Bosses had pleaded guilty, and it was given an instruction not to draw conclusions from their absence.  (1:04-CR-165, Dkt. No. 476, at 1406.)  Such instructions are appropriately given to jurors.  *See, e.g., United States v. Phillips*, 640 F.2d 87 (7th Cir. 1981); *United States v. Barrientos*, 758 F.2d 1152 (7th Cir. 1985).  Thus, the Bosses' mid-trial pleas did not result in specific and compelling prejudice to Marcusse.

15

**E. Ground 5: Argument (4)/Ground 12**

Marcusse argues that prior to, and during, her trial she was denied "use" of certain "bulk bank" records, and that this denial violated her right to a fair trial. (Dkt. No. 34, at 100-05, 167-73.) Marcusse argues that this denial of bank records resulted in violations of the rules set forth in *Brady v. Maryland*, 373 U.S. 83 (1963), 18 U.S.C. § 3500, the Fifth Amendment, and the Sixth Amendment. This argument is without merit.

The record unambiguously reflects that Marcusse had access to all the "bulk bank records" that were used to generate the government's summary exhibits for months, from the date of her initial appearance through the conclusion of her trial. For example, at one point in the trial, Marcusse's attorney complained, on her behalf: "There's just boxes and boxes of documents, Your Honor, and they're the documents that were used for the summary exhibits, and I certainly think she's entitled to them. I understand they've been there for months. Unfortunately, Mrs. Marcusse hasn't had access to them." (Dkt. No. 478, at 1988.) Government counsel responded to this allegation by stating:

> MR. GEZON: . . . .Mr. Kazcor I'm sure unintentionally misspoke that Ms. Marcusse has unfortunately not had these available to her. The record, of course, should reflect that since the first initial appearance on this indictment she has been offered to see these documents, and she has deliberately chosen not to accept these documents for reviewing although they've been repeatedly offered to her and the others to view for some six to nine months. . . .I just want to make sure this record is clear about the availability of these records.

(*Id.* at 1989-90.) Attorney Kazcor responded by acknowledging that the records, indeed, had been available:

> MR. KAZCOR: And I agree with that, and I didn't mean to implicate anything other than Mr. Gezon has been wonderful in making everything available. I just meant – and I didn't want to say she's been in jail, but she's been in jail and the documents have been here. But I know that they've been available. I know I've had an opportunity to review them, and I've met with Mr. Flink and I've looked at them.

(*Id.* at 1990.) The parties then agreed on arrangements for Marcusse to review the documents during the trial. Even though Marcusse was incarcerated prior to trial, there is no reason why she could not have reviewed the bulk bank records — the record demonstrates that they were made available to her, and arrangements could have been made for her to review them, for many, many months prior to trial. (*See also* Dkt. No. 518, at 3048 ("During the course of pretrial discovery [the government] offered all the government exhibits that we have been able to gather and they've been available. But Ms. Marcusse . . . and the other defendants pro se refused to look at those because they did not want to share their exhibits with us.") Thus, based on the record, it is clear that Marcusse had access to the "bulk bank" records.

Marcusse suggests that her complaint is that, although she was allowed to review the records, she was not allowed to "use" them in front of the jury because "prosecutors would deceitfully claim the document was not part of their admitted exhibits." (Dkt. No. 34, 169, 172.) Once again, the record does not support Marcusse's accusation of deceit by the government. On pages 3046-47 of the trial transcript, Attorney Kaczor, while conducting the direct examination of Marcusse, sought to introduce Marcusse Exhibit AA, a summary that Marcusse prepared, and mistakenly indicated that he had "gotten this from the government." (1:04-CR-165, Dkt. No. 518, at 3046.) Government counsel interjected,

stating that, in fact, government counsel had never seen the document before.  Attorney Kazcor subsequently acknowledged that the document did not, in fact come from the government. (*Id.* at 3049 ("[T]his exhibit I understood came from [the government], but I understand that it doesn't now and I'm willing to tell the jury that.").)  Marcusse testified that she prepared the exhibit, and it was admitted, over the government's objection that it was erroneously described as based on the government's records.  (1:04-CR-165, Dkt. No. 518, at 3056-57.)  Similarly, transcript pages 3141-42 address documents that Marcusse attempted to portray as having been taken from Government Bulk Exhibit 219, which Attorney Kazcor was later forced to acknowledge did not come from that exhibit.  (1:04-CR-165, Dkt. No. 519, at 3163-64 ("219 is a bulk exhibit and I had some documents that appeared not to come from that bulk exhibit, so I've deleted those.").)  The government did not object to the admission of other documents similar to records within Government Bulk Exhibit 203 that Marcusse had and wished to admit, and they were admitted. (*Id.* at 3165.)[4]

Sprinkled throughout these arguments are references to the Court's denial of certain subpoenas for bank records that Marcusse sought.  (*E.g.*, Dkt. No. 34, at 171.)  On the eve of trial, Marcusse filed a pro se letter directed to the Clerk of the Court with a bare-bones request for subpoenas seeking bank records from three accounts, two purportedly at the

---

[4]Numerous times on the stand, Marcusse alluded to bank records she possessed that the government would not let into evidence. (*E.g.* 1:04-CR-165, Dkt. No. 519, at 3191.)  During cross-examination, the government established that Marcusse had wholly failed to provide any of these records in response to numerous grand jury subpoenas. (*Id.* at 3190-93.)  Moreover, Marcusse has not explained what exhibits were not admitted or how such omissions prejudiced her.

Royal Bank of Scotland (Starbright Mgmt Ltd. and City Centre Management Ltd), and one at Union Planters Bank (MLC Developments Int'l Inc.). (1:04-CR-165, Dkt. No. 333.) The Court denied the motion because it would require the Court "to subpoena the individual responsible for keeping such records at the respective banks," and Marcusse had wholly failed to show that the subpoena expense was necessary for her to present an adequate defense, as required by Federal Rule of Criminal Procedure 17(b). (1:04-CR-165, Dkt. No. 342.)

This ruling was manifestly correct, as Marcusse failed to make any showing of necessity. Marcusse appears to be arguing that the records would have somehow validated her claim that she "invested" some of the victims' money in various off-shore accounts, including, $1.8 million in accounts at the Royal Bank of Scotland (managed by "Starbright Management" and "City Center Management"), $1.2 million of which Marcusse contends she transferred to the MLC Account at Union Planters Bank and ultimately gave to Robert Plaster as a down payment or nonrefundable deposit on land for the "Branson Project" that never materialized. (1:04-CR-165, Dkt. No. 519, at 3151-56.) But the government did not generally contest that she spent $1 million or so in this manner. (*E.g.* 1:04-CR-165, Dkt. No. 520, at 3373-75.) Those facts – and the "bank records" that may or may not have supported them – were irrelevant, as this Court tried to explain (1:04-CR-165, Dkt. No. 470, at 8-9) and as the court of appeals agreed in affirming the Court's decision to deny Marcusse's request for other subpoenas to witnesses who would have testified about the collateral "Branson

project." *See United States v. Flynn*, 265 F. App'x 443, 446 (6th Cir. 2008) (finding that individuals "were involved in matters collateral to the Access scheme and their testimony was not necessary to Marcusse's defense"). Thus, Movant's arguments lack merit.

### F. Ground 6: Argument (3)

Marcusse next claims that the Court violated her due process rights by failing in its jury instructions to address her good-faith belief in her alleged "church's" tax exemption under §§ 501 and 508 of the Internal Revenue Code. However, Marcusse raised no contemporaneous objection to this Court's instructions to the jury regarding §§ 501 and 508; in fact, she had little reason to object because this Court merely explained what those sections require (1:04-CR-165, Dkt. No. 522, at 3773), which was essential to evaluating any claim that she in good faith believed she complied with the law. Marcusse's failure to contemporaneously object to this Court's instruction addressing §§ 501 and 508 qualifies as a procedural default. *Frady*, 456 U.S. at 167-68; *Barajas-Diaz*, 313 F.3d at 1245. Because Marcusse does not show cause and actual prejudice, this claim is procedurally defaulted.

Even assuming her claim was not procedurally defaulted, the facts belie it. The Court did instruct the jury on the availability of a defense that a defendant had a good-faith belief that his or her conduct complied with the law's requirements. (1:04-CR-165, Dkt. No. 520, 3461-62; Dkt. No. 522, at 3762-63, 3766-67, 3773.) Moreover, the Court did so specifically in the context of §§ 501 and 508. (1:04-CR-165, Dkt. No. 522, at 3773.)

### G. Ground Eight: Argument (1)

Marcusse claims that the government had a pre-trial "strategy to strip the defendants of their right to proceed pro se." (Dkt. No. 34, at 146.)  As proof, she (1) points out that she and several of her co-defendants were prohibited from representing themselves without the assistance of appointed standby counsel (*id.* at 146), and (2) claims that at least two defense attorneys were promoted within the Public Defender's office after representing defendants in the case (*id.*).  This does not demonstrate that the government conspired to keep the defendants from representing themselves.  Indeed, nothing in the record supports Marcusse's allegation.

Marcusse's Sixth Amendment right to represent herself was not violated in this case because she was not denied that right. Following a full hearing pursuant to *Faretta v. California*, 422 U.S. 807 (1975), Marcusse was granted the right to represent herself.  (1:04-CR-165, Dkt. No. 178, at 4-12.)  The Office of the Federal Defender, initially Raymond Kent, and later David Kaczor, was appointed to assist Marcusse as standby counsel.  Prior to the commencement of trial, Marcusse filed, pro se, more than 25 pleadings, variously characterized as "motions," "complaints," "notices," and "demands."  Marcusse represented herself at hearings and, on more than one occasion, had to be removed from the courtroom as a result of disruptive behavior.  (*See, e.g.* 1:04-CR-165, Dkt. Nos. 180, 681.)  A few months before the trial started, Marcusse sought to "fire" Kaczor (1:04-CR-165, Dkt. No. 200), but the Court denied the motion, stating, "Mr. Kaczor has not been appointed to

21

represent Marcusse, as she has elected to represent herself. He has, however, been appointed as stand-by counsel for her to use or not use as she sees fit." (1:04-CR-165, Dkt. No. 213.) There is no question that, prior to and leading up to the commencement of the trial, Marcusse was proceeding pro se, and her right to represent herself was fully honored.

On the first morning of the trial, Marcusse demonstrated, through her behavior, that she was unable or unwilling to abide by courtroom protocol. During a colloquy with the Court prior to jury selection, she argued that the United States District Court for the Western District of Michigan was not a valid Article III court. (1:04-CR-165, Dkt. No. 470, at 9.) She demanded that the judge's oath of office be placed on the record. (*Id.* at 11.) At the point when she stated, "I am also here for full settlement and closure of the account and I would like my bid box back" (*id.* at 15), the Court became concerned that her inability to conform her conduct stood poised to prejudice not only herself, but the other defendants, in front of the jury (*id.* at 16-17). At that point, the Court temporarily suspended Marcusse's right to represent herself. This was not error. The Supreme Court has made clear that "[t]he right of self-representation is not a license to abuse the dignity of the courtroom." *Faretta*, 422 U.S. at 834 n.46. A defendant must be willing to abide by the rules of procedure and courtroom protocol. *McKaskle v. Wiggins*, 465 U.S. 168, 173 (1984).

At the same time, however, the Court reaffirmed, "If you can demonstrate to me at a certain point that you do understand what this trial is about and you can stay focused on what this trial is about, then I definitely believe that you have the right to represent yourself under

the Constitution." (1:04-CR-165, Dkt. No. 470, at 18.) Thus, before opening statements, Attorney Kaczor asked the Court to let Marcusse make her own opening statement, and after receiving assurances from Mr. Kaczor and Marcusse that she would respect the rules, such as confining the statement to what the evidence would show, the Court permitted her to do so. (*Id.* at 75-78.) Thereafter, prior to the testimony of the first witness, Marcusse, through stand-by counsel, requested permission to proceed with "hybrid" representation, whereby Attorney Kaczor and she would each conduct direct and crossexaminations of witnesses:

> MR. KACZOR: Your Honor, may I ask, I spoke with Mrs. Marcusse this morning and yesterday. It's my understanding that she wishes to continue to, as I say, represent herself, but at the same time she would like to have what I would call hybrid representation. She would like me to ask some questions of the witnesses while she may be permitted to ask questions of other witnesses, and I guess I'm asking for the Court's instruction. Will I be allowed to cross-examine the next witness, and assuming she can follow the rules of evidence, be allowed to cross-examine a witness after that? That's my understanding of what she would like, Your Honor.
>
> THE COURT: Very well.
>
> MR. KACZOR: Thank you, Your Honor.

(*Id.* at 140.)

Although Attorney Kaczor conducted the cross-examinations of most of the government's initial witnesses, when the government's financial fraud expert, Leonard Zawistowski, testified, Kaczor asked the Court if Marcusse would be permitted to ask additional questions of the witness, and the Court readily agreed. (1:04-CR-165, Dkt. No. 473, at 800.) In total, Marcusse cross-examined eighteen of the government's witnesses and

directly examined eight of her own witnesses.  Marcusse points to nothing in the record supporting her assertion that she was "not permitted to cross examine the first 18 witnesses." (Dkt. No. 34, at 146-47.)  Indeed, on the third day of trial, the Court inquired directly of Marcusse as to her satisfaction with the hybrid arrangement: "Okay. Mr. Kaczor helping here? Going fine?"  (1:04-CR-165, Dkt. No. 472, at 373.)  Marcusse responded in the affirmative: "Um-hum, thank you."  (*Id.*)  She did not complain about not having the ability to cross-examine witnesses or object to the admission of proposed exhibits.

Indeed, the record reflects that Marcusse was allowed to conduct her own defense to the extent and in the manner she requested.  While a defendant does not have a constitutional right to hybrid representation, a trial court has discretion to permit it.  *McKaskle v. Wiggins*, 465 U.S. 168, 183 (1984). *See also United States v. Mosely*, 810 F.2d 93, 97-98 (6th Cir. 1987); *Page v. Burger*, 406 F.3d 489, 495 (8th Cir. 2005).  In *McKaskle*, the Court held that the defendant's *Faretta* rights were not violated where the defendant vehemently objected to standby counsel's involvement prior to and at the beginning of trial, but subsequently agreed to or acquiesced in hybrid representation.  The Court observed that a defendant's views on the scope of involvement he desires from standby counsel may evolve as a trial progresses, noting, "[e]ven when he insists that he is not waiving his *Faretta* rights, a pro se defendant's solicitation of or acquiescence in certain types of participation by counsel substantially undermines later protestations that counsel interfered unacceptably." *Id.*  Thus, a "defendant's invitation to counsel to participate in the trial obliterates any claim that the

24

participation in question deprived the defendant of control over his own defense." *Id.* at 182. Moreover, "[s]uch participation also diminishes any general claim that counsel unreasonably interfered with the defendant's right to appear in the status of one defending himself." *Id.*

In *McKaskle*, the defendant filed many pro se motions before and during trial, and gave the opening statement, although he permitted his counsel to give the closing argument. *Id.* at 174-75, 182-83. The same sort of hybrid representation occurred here, and thus Marcusse's Sixth Amendment right to represent herself was not violated.

### H. Ground Eleven: Argument 2

Marcusse also argues that "the presence of the IRS Agents" at the grand jury proceedings violated Federal Rule of Criminal Procedure 6(d). (Dkt. No. 34, at 164.) This claim is procedurally defaulted because neither Marcusse nor her appellate counsel raised it on direct appeal.

Additionally, it is without merit. Marcusse implies that IRS agents were present in the grand jury courtroom while witnesses testified, but she never actually says that. Marcusse asserts that agents were present "at the grand jury" and alleges that she brought this "tainting of the grand jury" to the attention of the Court before trial. (Dkt. No. 34, at 164 (citing 1:04-CR-165, Dkt. No. 152, at 1).) In that document, entitled, "Criminal Complaint: Affidavit of Facts: Made Under Duress: October 24, 2004," Marcusse states the general rule that "[t]he presence of unauthorized persons in the grand jury room could invalidate an Indictment" and then asserts: "Unauthorized person, James Flink, of the IRS was present at

the May 22, 2002 grand jury I attended." (1:04-CR-165, Dkt. No. 152, at 1.) Marcusse never actually alleges that Agent Flink or any other agent was present in the grand jury courtroom while she or any other witness testified.

This omission is fatal to Marcusse's claim, as she has failed to rebut the presumption of regularity that attaches to grand jury proceedings. *See, e.g., United States v. Breitkreutz*, 977 F.2d 214, 217 (6th Cir. 1992) (holding that the defendant has the burden of demonstrating abuse of process as a presumption of regularity attaches to grand jury proceedings); *United States v. Castro*, 908 F.2d 85, 89 (6th Cir. 1990) (holding that the defendant's bare allegations of government misconduct before the grand jury do not make the required showing of prosecutorial misconduct). Moreover, Defendant Flynn's attorney asked IRS Agent Flink at trial whether Flink was in the grand jury courtroom when Flynn testified, and Agent Flink testified that he was not. (1:04-CR-165, Dkt. No. 478, at 1961.) Similarly, Bonnie Kurnat, one of the witnesses, also testified that neither Agent Flink nor any other agents were in the grand jury courtroom at the time she testified. (1:04-CR-165, Dkt. No. 474, at 1102.) In light of this testimony, and absent any allegations that any IRS agents were actually present during the testimony of any witness, the Court finds Marcusse's claim to be without merit.

**I. Ground Sixteen: Argument (1)**

Marcusse contends that the superseding indictment was defective as both "duplicitous" and "multiplicitous" because the government allegedly charged a tax offense

as part of a Ponzi scheme and charged that the same conduct constituted both money laundering and mail fraud.  (Dkt. No. 34, at 191, 193.)  Marcusse insists that she preserved the argument in pretrial motions.  (*Id.* at 193 (citing 1:04-CR-165, Dkt. Nos. 312, 315, 317).)  However, she did not actually consistently raise the same "multiplicity" or "duplicity" argument in her pre-trial motions, on direct appeal, and now on her 2255 petition.  The phrase "duplicitous or multiplicitous" appears in one of her pre-trial motions  (1:04-CR-165, Dkt. No. 312), but she misused the terms (as she does in her 2255 brief).  She argued that the mail fraud counts should be dismissed because the money laundering counts incorporated the allegations underlying the mail fraud counts.  On top of that, she contended that those money laundering counts were defective because "mere 'spending' does not constitute money laundering."  (*Id.*)  She then argued that the indictment included both mail fraud and money laundering charges "for prejudicial and inflammatory reasons."  In other words, she claimed the indictment was multiplicitous in the sense that it simply alleged the same conduct (but not the same offense) more than once and that it was duplicitous in the lay sense of the word because it alleged the same conduct in more than one offense for illegitimate reasons.  She did not contend in her pretrial motion that the government's charging of tax offenses as part of a Ponzi scheme was multiplicitous or duplicitous in a lay or any other sense of the terms.

In contrast, on direct appeal, she contended under the multiplicity/duplicity banner that the government switched theories mid-trial for the mail fraud counts from a Ponzi theory to a failure to file taxes theory and improperly charged more than one conspiracy.  (*See* Pro Se

27

Appeal Br. 86.)  She did not repeat her claim that "mere 'spending' does not constitute money laundering" such that the substantive money laundering and mail fraud counts are defective.  Nor did she contend on direct appeal that the indictment improperly re-alleged the same conduct in the substantive money laundering and mail fraud counts.  Because Marcusse did not raise the same "duplicitous" or "multiplicitous" argument both in the district court and then on appeal that she raises now in her 2255 motion, she has procedurally defaulted the claim.  Marcusse offers no argument establishing either her cause for failing to properly raise the claims or any actual prejudice sufficient to overcome her default.  *See Frady*, 456 U.S. at 167-68.

Even if the "duplicitous/multiplicitous" claim was preserved, it lacks merit.  An indictment is duplicitous when it charges more than one distinct offense in a single count.  *United States v. Davis*, 306 F.3d 398, 415 (6th Cir. 2002).  Similarly, it is multiplicious when it charges one offense in multiple counts.  *United States v. Swafford*, 512 F.3d 833, 844 (6th Cir. 2008).  None of Marcusse's various versions of the claim in the district court, on appeal and on collateral attack actually speak to these alleged types of defects.  To the extent they might, the claim lacks merit.  "A defendant may be charged with multiple offenses based on the same underlying conduct as long as each offense requires proof of an element not required by the other."  *United States v. Kelly*, 204 F.3d 652, 656 (6th Cir. 2000).  When Congress has authorized punishment for specific types of conspiracies, a defendant may be prosecuted for each, regardless of whether the different prohibited objects were the subject

28

of but one conspiratorial agreement.  *See Albernaz v. United States*, 450 U.S. 333, 337-41 (1981).  Each conspiracy offense is separate and distinct from the commission of the underlying substantive offenses and may even incorporate more than one substantive violation as separate objects of that single conspiracy.  *Braverman v. United States*, 317 U.S. 49, 52-54 (1942); *Beckman v. United States*, 890 F.2d 416 (6th Cir. 1989).

With these principles in mind, the charging of mail fraud and money laundering was neither duplicitous nor multiplicitous.  This is true even though some of the money laundering counts were based on the same underlying conduct as the mail fraud counts, and even though some of the money laundering counts are properly considered defective under *Santos*.  Each offense required proof of an element the other did not.  *Kelly*, 204 F.3d at 656. It is neither duplicitous nor multiplicitous for later counts in an indictment to incorporate allegations in prior counts rather than repeat the content.  Moreover, contrary to the heading of Marcusse's claim, the government actually charged the *Klein* conspiracy (what she calls the tax offenses) separately from the mail fraud (Ponzi) scheme – eliminating any chance of duplicity.

Nor did this Court render some sort of duplicity type of error, as Marcusse appears to claim, when it listed the *Klein* conspiracy count (Count 42) along with the money laundering counts (Counts 43-57) in the course of instructing the jury on the meaning of "willful" action and its opposite, "good faith" action.  (1:04-CR-165, Dkt. No. 522, at 3761-62.)  Marcusse's willfulness or claimed good faith were at issue for all of those counts.  This Court did not

merge the offenses and, in fact, set forth their separate elements later in the instructions. (*Id.* at 3767-71.)

Nor was there multiplicity in the charging of the money laundering conspiracy separate from the mail fraud and *Klein* conspiracies. Congress authorized separate punishment for a money laundering conspiracy. *Albernaz*, 450 U.S. at 337-41; 18 U.S.C. § 1956(h). Moreover, the charging of the mail fraud conspiracy separately from the *Klein* conspiracy was not multiplicious because each was a separate agreement with distinct victims; the former to cheat investors via mail fraud and the latter to defraud the United States by frustrating and impeding the IRS. As alleged in the indictment, some of the same conduct facilitated each conspiracy; but the two were not one agreement. *See, e.g., United States v. Ingman*, 541 F.2d 1329, 1331 (9th Cir. 1976) (holding that an action may be in furtherance of two or more conspiracies; some interrelationship between conspiracies does not make them one). Lastly, even if there was a multiplicity problem with these latter conspiracy counts, Marcusse incurred no prejudice because the convictions merged for purposes of sentencing. *United States v. Reed*, 639 F.2d 896 (6th Cir. 1981).

**J. Ground Seventeen: Argument (2)**

Marcusse argues that the Court improperly denied her certain exculpatory evidence and witness testimony regarding her mail fraud, money laundering, and conspiracy charges. Specifically, Marcusse argues that she was denied wire transfer records (Dkt. No. 34, at 204-05), and that her subpoena requests were improperly denied (*id.* at 198).

As to the wire transfer records, neither Marcusse nor her counsel raised the issue at trial and therefore it is procedurally barred. Moreover, the claim is without merit because the records were made available to her. (*See, e.g.*, 1:04-CR-165, Dkt. No. 472, at 630.) As to the subpoenas, the claim is largely barred by the rule against relitigation. "A § 2255 motion may not be used to relitigate an issue that was raised on [direct] appeal absent highly exceptional circumstances." *Dupont v. United States*, 76 F.3d 108, 110–11 (6th Cir. 1996) (citing *United States v. Brown*, 62 F.3d 1418 (6th Cir. 1995)). After trial began, Marcusse initially filed an ex parte request for 30 subpoenas for witnesses at government expense pursuant to Federal Rule of Criminal Procedure 17(b), including Attorney General John Ashcroft, Federal Reserve Chairman Alan Greenspan, and other federal officials. (1:04-CR-165, Dkt. Nos. 379, 384.) The Court denied this request. Subsequently, Marcusse submitted another request listing 26 potential witnesses, and included a summary of each witness's anticipated testimony. (1:04-CR-165, Dkt. No. 392.) The Court granted the request with respect to 14 of the proposed witnesses, and denied the request with respect to the remaining 12 because the proposed testimony of those witnesses was irrelevant and/or cumulative. (1:04-CR-165, Dkt. No. 401.)

At trial, Marcusse renewed her request only as to three witnesses: Reede Hubert, Ed Terlesky, and Richard Williams. (1:04-CR-165, Dkt. No. 514, at 2222.) Marcusse's appellate counsel challenged the Court's denial of subpoenas to those three witnesses in her direct appeal, and the court of appeals rejected that claim: "the court correctly concluded that,

inasmuch as these individuals were involved in matters collateral to the Access scheme at issue in this case, their testimony was not necessary to Marcusse's defense." *United States v. Flynn*, 265 F. App'x 434, 446 (6th Cir. 2008). Williams did, in fact, testify, and the court of appeals held that his testimony, which related to the so-called "Branson project," confirmed the collateral nature of the witnesses' proposed testimony. *See id.* Thus, this argument is barred by the relitigation doctrine as to the three witnesses directly addressed in the court of appeals' opinion.

As for the remaining nine witnesses, Marcusse's claim is without merit. Rule 17(b) allows a court to issue subpoenas for indigent defendants if the defendant shows "the necessity of the witnesses' presence for an adequate defense." The court is to consider the timeliness of the request, materiality, relevance, and cumulativeness of the testimony. *United States v. Moore*, 917 F.2d 215, 230-31 (6th Cir. 1990); *see also United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 & n.7 (1982). The trial court is granted wide discretion to ensure that the requests are specific, clearly articulating the necessity and to insure the process is not being subject to abuse from a defendant's inappropriate requests for witnesses. *United States v. Rigdon*, 459 F.2d 379, 380 (6th Cir. 1972). General assertions of topics the witness may cover do not meet this test. *Id.*; *United States v. Conder*, 423 F.2d 904, 909 (6th Cir. 1970); *United States v. Barker*, 553 F.2d 1013, 1020-21 (6th Cir. 1977). Even on direct appeal, an appellate court will not reverse a district court's denial of a subpoena unless "exceptional circumstances" indicate that the defendant's "right to a

complete, fair and adequate trial is jeopardized." *United States v. Moore*, 917 F.2d 215, 230 (6th Cir. 1990); *see also United States v. Blackwell*, 459 F.3d 739, 752 (6th Cir. 2006).

Applying this standard—and the court of appeals' ruling that denial of subpoenas for witnesses whose testimony would relate to collateral matters was appropriate—it is manifest that no constitutional error occurred. Robert Plaster, in fact, testified. (1:04-CR-165, Dkt. No. 515, at 2241-81.) Gerard Forrester is allegedly a senior supervisory agent for the FBI who purportedly authored letters "endorsing" the Bahamian bank Marcusse maintains she invested money in. (1:04-CR-165, Dkt. Nos. 392, at 8; 401, at 3.) Christopher Lunn and Raymond Winder also were to testify about matters relating to the Bahamian bank (Suisse Security Bank & Trust). (1:04-CR-165, Dkt. No. 392.) David Pointer, Darwin Kal, Randy Scott, and Christi Heuck, were all to testify about the collateral Branson project. (*Id.*) Matt Rydberg was alleged to be the son of someone who allegedly had entered into a contract to receive Access funds overseas. (*Id.*) His testimony had to do with the alleged Nigerian "investments" that were made (the "Crawford project"). The Court appropriately ruled that all of this proposed testimony was unnecessarily cumulative, given that other witnesses testified about that matter and that the whole subject had marginal or no relevance because the issue was the representations Marcusse made to the investor-victims about their money being placed in "safe" investment vehicles with a guaranteed (high) rate of return. (1:04-CR-165, Dkt. No. 401, at 4.) The Court also appropriately found that the proposed testimony of Cheryl Gardner and Scott Addison regarding this Court's First Amendment violations, was

irrelevant. (1:04-CR-165, Dkt. No. 392, at 15.)

Finally, Marcusse's claim that she was "denied" four witnesses by her trial counsel, Attorney Kaczor, is likewise without merit. As to three of those witnesses, Marcusse herself agreed on the record to release those individuals from their subpoenas. (1:04-CR-165, Dkt. Nos. 514, at 2223; 515, at 2231.) The remaining witness, Dan Evans, purportedly would have testified about whether Robert Plaster was a "'principle [sic], shareholder, director, founder, or CFO' of MLC Development." Again, this concerned the Branson MLC project that the Sixth Circuit deemed a collateral matter. *Flynn,* 265 F. App'x at 446. Thus, even if Marcusse could somehow show that Attorney Kaczor's inability to locate Mr. Evans was "deficient performance" under *Strickland*, she could not possibly establish that she was prejudiced by not having this witness available to testify.

### K. Ground Seventeen: Argument (4)

Marcusse alleges that she was denied her right to defend against the alleged tax violations when the Court allegedly barred her in its pretrial order from offering into evidence statutes and case law as evidence of her good-faith belief. (Dkt. No. 34, at 113, 211.) Marcusse's claim is both procedurally defaulted and without merit.

Marcusse neither identified in her direct appeal nor identifies in her 2255 motion what statute or case law she attempted to offer as evidence of her good faith belief but could not offer on account of this Court's order. On appeal, she cited an objection to her opening statement that was not sustained, her concerns for reciprocal discovery, the allegation that

34

she lacked access to certain bank records of one witness, her general objection that witnesses perjured themselves, and an unsupported allegation that appointed counsel was on the government's side.  (*See* Pro Se Appeal Br.)  In contrast, in her 2255 motion, Marcusse largely alleges that the government made her claimed good-faith belief appear unreasonable by describing Access Financial as a "check-book church," and that the government ignored certain allegedly exculpatory evidence as part of its case against her.  (Dkt. No. 34, at 113, 211-14.)  The former contention is irrelevant and lacks merit because the government's argument was proper.  *See Cheek v. United States*, 498 U.S. 192, 203-04 (1991) ("Of course, the more unreasonable the asserted beliefs or misunderstandings are, the more likely the jury will consider them to be nothing more than simple disagreement with known legal duties imposed by the tax laws and will find that the Government has carried its burden of proving knowledge.").  The latter argument is a challenge to the adversarial trial system and again irrelevant to her claim regarding this Court's order.  In any event, because the same version of this claim does not consistently appear in the trial proceedings, direct appeal, and 2255 petition, Marcusse has procedurally defaulted it.  *See Frady*, 456 U.S. at 167-68.  Her failure in the 2255 motion to show cause and actual prejudice warrants dismissal of the claim.  *Id.*

On the merits, this Court's order did not actually preclude her from offering statutes or case law or excerpts thereof in support of a claim that she in good-faith believed she was complying with the requirements of the law.  Rather, the Court simply ordered, consistent with Sixth Circuit precedent, that Marcusse could not ask the jury to decide whether she was

correct in her belief that her conduct complied with the law.  (1:04-CR-165, Dkt. No. 338, at 3-4.)  *See United States v. Wunder*, 919 F.2d 34, 35 (6th Cir. 1990).  That would be a question of law that is not for a jury to decide.  *Id.*  This Court was aware that it had the discretion to permit the defendants to introduce some documentary evidence that defendants claimed supported their good faith; accordingly, this Court deferred ruling on any particular exhibit the defense might offer at trial until the Court had an opportunity to review it to assess it for relevancy and likelihood of confusion.  (1:04-CR-165, Dkt. No. 338, at 8.)  Marcusse cites no statute or judicial decision or excerpt thereof that this Court refused to allow her to show the jury in support of her claimed good faith belief.  Thus, this claim lacks merit.

### L. Ground Eighteen: Argument (1)

Marcusse alleges that witnesses were threatened and tampered with by the prosecution, IRS agents, and FBI agents.  (Dkt. No. 34, at 214-18.)  However, Marcusse provides no support for her accusations.

Marcusse accuses the government of implicitly "threaten[ing]" the witnesses because it took pictures of them.  However, the government was only complying with the Court's order to take picture of each witness it intended to call to assist the jury in remembering the 100+ witnesses.  Moreover, not one witness testified or stated under oath that he or she was threatened or intimidated by any government agent.  Christopher Milson, Marcusse's boyfriend, submitted an affidavit obliquely referencing (but not naming) "two potential

witnesses that would not testify because they were intimidated and frightened away by the IRS." (Dkt. No. 34, at 214 & Ex. XXXX.) Marcusse also submits an affidavit from Kim Newell, a defense witness, who was uncomfortable with the pictures, but she still testified. Marcusse additionally points to investor-victim Mike Brewer, who she alleges was coached and signaled. However, Brewer testified that he was *not* being "coached" or "signaled" by the prosecutor as to how to answer questions. (1:04-CR-165, Dkt. No. 474, at 1166.)

Marcusse also alleges, without support, that Virgil Boss was tampered with because of his arrest on an outstanding warrant during the trial by an Ottawa County Sheriff's Deputy. But he was subsequently released on bond and *did* testify. (1:04-CR-165, Dkt. No. 516, at 2539-67.) Similarly, Marcusse alleges that the government threatened to prosecute Tom Wilkinson if he appeared, leading to him not testifying. But in reality, the government decided not to call Wilkinson, a target of a federal investigation, after he advised it that he would invoke the Fifth Amendment if called to testify. (1:04-CR-165, Dkt. No. 518, at 2872-73.) The defense determined that it would not call him as a witness, either. (*Id.* at 2874.) That is not evidence of intimidation. Nor was Reverend Blauwkamp "threatened with a jail cell over his statement and forced to testify," as Marcusse claims. (Dkt. No. 34, at 215.) Blauwkamp explained during his testimony that any reference to a "jail cell" was made in the context of a "comment about lying to federal prosecutors in our conversations," and he noted that he had not lied to any prosecutors. (1:04-CR-165, Dkt. No. 14, at 2763.) The remaining allegations pertaining to alleged "witness tampering" relate to Bruce

Marcusse.  Marcusse's allegations concerning transcript tampering and Bruce Marcusse lying have no support whatsoever.  The testimony was accurately recorded, and Marcusse has presented no actual of evidence of any tampering.

### M. Ground Nineteen: Argument (1)

Marcusse alleges prosecutorial misconduct occurred during closing arguments which violated her right to Due Process. (Dkt. No. 34, at 218-23.)  Marcusse is not entitled to collateral relief on this claim.  First, neither Marcusse nor her trial counsel made any objections during the government's closing argument.  Therefore, although Marcusse raised this claim in her pro se direct appeal brief, her failure to raise it at trial constitutes procedural default.  Moroever, although Marcusse cannot complain that she received ineffective assistance of trial counsel, given her pro se status, Marcusse would not be able to establish that the performance of either trial counsel or appellate counsel was deficient in failing to raise this issue because it is without merit.  Additionally, in light of the significant evidence against Marcusse, she could not establish actual prejudice, as necessary to cure the default.

Marcusse argues that the prosecutor "lied" to the jury, citing several statements that she claims are untrue.  (Dkt. No. 34, at 219.)  But each of the challenged statements was supported by the record.  Marcusse states that "[AUSA] Gezon lies, claiming not just 'early', but 'late' investors were given GX-1." (*Id.*)  At least two "late" investors testified to having received Government Exhibit 1.  (1:04-CR-165, Dkt. Nos. 472, at 412-12; 475, at 1197-98.)  Marcusse also states, "Gezon lies, claiming there were no bank statements showing Marcusse

made investments for the Bahamas program." (Dkt. No. 34, at 219.) But Agent Flink testified to that effect (1:04-CR-165, Dkt. Nos. 513, at 2129-30; 520, at 3376-79), and the "summary" exhibit in which Marcusse alleged that she made sizeable investments in the Bahamas was not supported by actual bank statements. Although some money was placed into a "Screw the IRS" account, none of that money was placed into a safe CD-like environment, as promised by Marcusse, and none of it ever made its way back to the investors in the form of returns. (1:04-CR-165, Dkt. No. 513, at 2129-30.)

Marcusse alleges that the prosecutor lied when he said that the $25.5 million check that Marcusse supposedly received in connection with the "Crawford project" was never deposited into the bank, but there is no dispute that the "check" was stamped "uncollectible" by the bank and, thus, the funds were not deposited. (1:04-CR-165, Dkt. No. 519, at 3130-31.) The prosecutor allegedly "lied" when he said that Marcusse gave Robert Plaster a non-refundable $1 million deposit, but that is what Marcusse herself said – that she gave $1 million to Michael Carney, who in turn gave it to Plaster, for that purpose. (1:04-CR-165, Dkt. No. 515, at 2243-45; Dkt. No. 519, at 3207-08.) The prosecutor allegedly "lied" when he said "we'll never know what she did with all that money" but the entire trial demonstrated the truth of that statement. The government looked at between 70 to 80 bank accounts, analyzing all of the checks and deposits, and was able to trace the money as being filtered through 20 primary accounts and then being sent into numerous other bank accounts "in thousands of different directions." (1:04-CR-165, Dkt. No. 520, at 3364.) It was determined,

through these exhaustive efforts (since defendants did not produce actual Access business records) that, of the $20.7 million of victim-investor funds, $8.4 million went back to the victims in "fake" interest checks or "lulling payments" (1:04-CR-165, Dkt. No. 521, at 1732-33), the defendants took $4.8 million for themselves (*id.* at 1733), and $7.3 million was spent in various ways, including $2.3 million in alleged "foreign wire transfers," none of which had any indication of being sent to legitimate investment organizations (1:04-CR-165, Dkt. No. 478,  at 1928).   The prosecutor's statement was not a "lie."   Nor was the prosecutor's statement that "Ponzi scheme" was not in the indictment; it was not.  In short, every statement the prosecutor made was supported by the evidence and there is no basis whatsoever to conclude that he ever "lied."

Marcusse's other argument relating to closing argument is that the prosecutor made statements expressing a personal belief as to Marcusse's credibility. This argument lacks merit because the prosecutor's comments were entirely supported by the record and wholly proper.  A conviction will not be reversed based on a prosecutor's comments during closing argument unless the comments are both "improper" and "flagrant." *United States v. Rose*, 522 F.3d 710, 715-16 (6th Cir. 2008); *United States v. Carroll*, 26 F.3d 1380, 1386 (6th Cir. 1994).  Four factors are considered in determining flagrancy: (1) whether the statements tended to mislead the jury or prejudice the defendant; (2) whether the statements were isolated or among a series of improper statements; (3) whether the statements were deliberately or accidentally placed before the jury; and (4) the total strength of the evidence

against the accused. *Rose*, 522 F.3d at 716 (2008). If the comments were not flagrant, reversal is only warranted if a reviewing court determines that: (1) the proof of the defendant's guilt is not overwhelming; (2) the defense counsel objected; and (3) the trial court failed to cure the impropriety by failing to admonish the jury." *United States v. Trujillo*, 376 F.3d 593, 613 (6th Cir. 2004). Where there is no objection at trial, on direct review, the defendant must overcome the additional hurdle of plain error review.

Most of the challenged comments were appropriate comments based on the evidence and reasonable inferences to be drawn therefrom. The prosecutor referred a handful of times to the evidence supporting a finding that Marcusse was a "scammer and a liar," but accompanied these references with frequent reminders to the jury that it was their job to decide the credibility of the witnesses. (1:04-CR-165, Dkt. Nos. 521, at 3527; 522, at 3713, 3722, 3499.) These characterizations were not improper personal opinion, but proper comments on the evidence and a reasonable inference to be drawn from it. *See United States v. Reliford*, 58 F.3d 247, 250 (6th Cir. 1995) (finding that prosecutor's comment that Defendant's testimony was "unbelievable," "ridiculous," and "a fairy tale" not improper where prosecutor relied on the evidence to support comments); *Mason v. Mitchell*, 95 F. Supp. 2d 744, 781 (N.D. Ohio 2000) (prosecutor's characterization of defense theory as "preposterous" not improper where comment was based on reasonable inferences from the evidence). Indeed, it was the government's burden to establish that Marcusse engaged in a fraudulent scheme, and therefore argument pointing to evidence of her untruthfulness is not

objectionable.  Comments questioning the credibility of her co-defendants' claims that they were unaware of her schemes are similarly unobjectionable.

Moreover, Marcusse testified, putting her credibility into question.  A defendant who takes the stand "puts his veracity at issue," and therefore a prosecutor may comment on the believability of his testimony, so long as the comment is based on references to the testimony itself and does not imply a personal opinion.  *See United States v. Veal*, 23 F.3d 985, 989 (6th Cir. 1994).  Scouring the transcript, there appears to be only one isolated statement that even arguably was improper: immediately after telling the jury, "As you've heard before, you're going to be the judges of credibility," the prosecutor stated, "and as you heard Mr. Valentine say, he and I share the same view about Ms. Marcusse's credibility. It's zero. It's less than zero. She's a salesperson . . . a dishonest and immoral salesperson according to this evidence."  (1:04-CR-165, Dkt. No. 522, at 3722.)  Although prosecutors should not make expressions of personal belief as to witness credibility, that isolated comment does not come close to meeting the standard for "flagrant" error.  It was isolated, and did not permeate the trial.  Indeed, to the contrary, the statement was made immediately after the prosecutor cautioned the jurors that it was their job to decide the credibility of witnesses, and similar references were made throughout the argument.  In short, the single comment did not "permeate" the entire atmosphere of the trial.  *See Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997) (holding that a conviction will not be reversed based on prosecutor's alleged misconduct unless misconduct was "so pronounced and persistent that it permeate[d] the

42

entire atmosphere of the trial . . . or so gross as probably to prejudice the defendant").

### N. Ground Twenty: Argument (1)

Marcusse alleges ineffective assistance of trial counsel. (Dkt. No. 34, at 223-36.) She further alleges her counsel colluded with the Court and government. (*Id.* at 236.) These arguments are wholly without merit. First, "[a] defendant who elects to represent himself cannot thereafter complain that the quality of his own defense amounted to a denial of effective assistance of counsel." *Wilson v. Parker*, 515 F.3d 682, 696 (6th Cir. 2008) (quoting *Faretta v. California*, 422 U.S. 806, 834 n.46 (1975)). In *Wilson*, the Sixth Circuit rejected a pro se defendant's claim of ineffective assistance of standby counsel because logically, "a defendant cannot waive his right to counsel and then complain about the quality of his own defense," and to the extent standby counsel failed to act during trial, the defendant "merely suffered the consequences of his decision to proceed pro se." *Id.* at 696-97; *see also Holmes v. United States*, 281 F. App'x 475, 481 (6th Cir. 2008) (holding that the Sixth Circuit "will not impose upon stand-by counsel the same obligations that an attorney would have if [the defendant] were not proceeding pro se"). This rule is not altered merely because Marcusse elected hybrid representation. *See, e.g., Blanton v. Thaler*, 2010 WL 5538408, at *3 (N.D. Tex. Dec. 7, 2010) (holding that where counsel and defendant split some of the responsibilities at trial, defendant nevertheless remained pro se and could not challenge standby counsel's effectiveness).

Second, even if Marcusse did not give up her right to challenge counsel's

effectiveness when she elected to proceed pro se, standby trial counsel was not ineffective.

A defendant claiming ineffective assistance of counsel must establish two elements: (1) that

defense counsel's performance fell below an objective standard of reasonableness; and (2)

there is a reasonable probability that, but for the deficient performance, the outcome of the

proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 694 (1984).

Marcusse's claim fails on both *Strickland* prongs. As Attorney Kaczor's affidavit explains,

despite the fact that Marcusse refused to discuss her case with him, he met with her ten times

prior to trial and spent 87.8 hours preparing for trial. (*See* Dkt. No. 60, ¶¶ II, JJ.) He met

with Marcusse an additional six times at the jail during the trial and consulted with her

virtually every day prior to trial. (*Id.* at ¶LL.) He reviewed all *Jencks* material, all witness

statements, videos, and transcripts. (*Id.* at ¶JJ.) He cannot recall a single request regarding

the trial, trial procedure, or trial strategy made by Marcusse that he did not try to accomplish.

(*Id.* at ¶OO.) Thus, none of Marcusse's allegations establishes deficient performance or

prejudice under *Strickland*.

### O. Ground Twenty-One: Argument (2)

Marcusse essentially contends that this Court was biased against her, usurping the role

of the jury, when this Court "tied" the government's proffered evidence to counts in the

indictment during instructions to the jury. (Dkt. No. 34, at 2255.) However, the Sixth Circuit

has recognized the following:

> [T]he judge in a criminal trial "is more than a mere arbiter to rule upon
> objections and to instruct the jury." . . . Rather, the trial court has the

> responsibility of assuring "that the issues are not obscured and that the
> testimony is not misunderstood." The court may therefore "interject itself into
> the proceedings when 'necessary to clear up confusion in the evidence or to
> supplement, in an impartial fashion, the presentation . . . .'"

*United States v. Hynes*, 467 F.3d 951, 958 (6th Cir. 2006) (internal citations omitted).  The

three factors to consider in evaluating whether a court has so overstepped its role as to bias

the case before the jury are: (1) "the nature of the issues at trial," such as whether the trial

was "lengthy" or "complex;" (2) the "conduct of counsel," such as where counsel was

"unprepared or obstreperous" or "the facts are becoming muddled"; and (3) whether conduct

of the witnesses was confusing the record in a manner the court could correct.  *Id.*

Here, Marcusse fails to show any error under these factors. This Court, in a neutral

fashion, simply facilitated the orderly presentation of proofs in a long and relatively complex

case in which pro se representation had a tendency to result in a muddling of the issues.

Even if the Court overstepped its bounds, Marcusse cannot show she was prejudiced, as the

evidence of her guilt was significant.

### P. Ground Twenty-One: Argument (3)

Marcusse claims that this Court's instructions to the jury for "gross income" and

"exempt church organization" were improper.  She notes counsel sought clarification of the

definition of "gross income" through an instruction that "gross income does not include

loans, gifts, or monies received to be transferred at another's direction."  (Dkt. No. 34, at

241.)  As for "exempt church organization," she alleges that counsel failed to object to this

Court's statement that, for a church to qualify for tax exemption, "no part of its earnings

45

[may] inur[e] to the benefit of any one individual."  (*Id.*)

On federal habeas corpus review, a constitutional error that implicates trial procedures shall be considered harmless unless it had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).  If this Court is sure that the error had no or very slight effect or influence on the jury's decision, the verdict and judgment must stand.  *O'Neal v. McAninch*, 513 U.S. 432, 436-38 (1995).  To warrant habeas relief because of incorrect jury instructions, a petitioner must show that the instructions, as a whole, were so infirm that they rendered the entire trial fundamentally unfair.  *Estelle v. McGuire*, 502 U.S. 62, 72 (1991).  Thus, an appropriate, but omitted, instruction is less likely to warrant relief than an outright misstatement of the law by the court. *United States v. Jamieson*, 427 F.3d 394, 414 (6th Cir. 2005).  A defendant is entitled to an instruction on the law when the requested instruction is not "incomplete, misleading, confusing or otherwise prejudicial" in the context of the proofs at trial, *United States v. Carney*, 387 F.3d 436, 448–49 (6th Cir. 2004), and there is sufficient evidentiary support for a reasonable jury to find in her favor on the question.  *Mathews v. United States*, 485 U.S. 58, 62 (1988); *United States v. Bailey*, 444 U.S. 394, 415 (1980).

Here, the parties did not dispute the government expert witness's definition of what does and does not qualify as gross income that formed the basis for the defense request, including that loans, gifts and funds held for another are not gross income. (1:04-CR-165, Dkt. No. 515, at 2347-49.)  As for the "exempt church organization" instruction, Marcusse

likewise cannot show that this Court's clarification of when a church may qualify for tax exemption rendered her entire trial unfair. This Court pulled the requirement that "no part of its earnings inur[e] to the benefit of any one individual" directly from the qualifications for a tax exempt religious organization set forth in § 501(c) – which, contrary to Marcusse's claims, do apply to entities proclaiming themselves churches under § 508. *Branch Ministries v. Rossotti*, 40 F. Supp. 2d 15, 20 (D.D.C. 1999); 26 U.S.C. § 501(c). The instruction was perfectly correct. The requirement is simply part of the broader notion that, in order for a 501(c) entity to qualify for tax exempt status, it must actually operate for public benefit and not for the personal financial gain of individuals such as investors. *See, e.g.*, *Am. Campaign Acad. v. Comm'r of Internal Revenue*, 92 T.C. 1053, 1063, 1989 WL 49678 (1989) ("In other words, when an organization permits its net earnings to inure to the benefit of a private shareholder or individual, it transgresses the private inurement prohibition and operates for a nonexempt private purpose.").

Marcusse relies in her petition on the inapplicable principle that a tax-exempt organization may retain its exempt status even when it partners with a for-profit organization to further its public purpose as long as the for-profit organization maintains no control over the exempt organization's function. *See St. David's Health Care System v. United States*, 349 F.3d 232, 237-38 (5th Cir. 2003) (explaining the *Plumstead Theatre* case upon which Marcusse relies). But, conversely, where "the non-profit's activities via [a] partnership are not exclusively or primarily in furtherance of its non-profit purposes . . . the non-profit is not

entitled to a tax exemption." *Id.* This nuance in the tax law is inapplicable to Marcusse's case because Access Financial was never otherwise established as a bona-fide exempt entity, nor did it enter into formal partnerships – much less partnerships that exclusively or primarily furthered a public purpose. Rather, according to Marcusse herself, Access Financial purported to be an investment program operated exclusively or primarily for the financial gain of its operators and (at least purportedly) investors.

For example, in Marcusse's direct examination she described how she created "Sanctuary Ministries" for "investors," "started selling" "program[s]" to "investors," some of which "paid ... ten or eleven percent," and from one of which they "had gotten all of our principal back out plus a decent profit." (1:04-CR-165, Dkt. No. 515, at 3018, 3020, 3022.) As others joined in on her scam and the effort grew, she created "Access Financial" as an umbrella organization for which she drew-up "private placement" memoranda because "[t]he only thing that seemed to make any good sense for a description of this was a private placement in that it was a private group for a private purpose. I mean, we may have helped the public, but the intent on that was for a later date . . . ." (*Id.* at 3029.) The "purposes of th[e] document [was so] that the investor would understand that it was an investment and that Access Financial was not to be held responsible." (*Id.* at 3029.) In closing argument, defense counsel explained that: "She said basically invest with me. I will put your money into a variety of projects. . . . I will use my best efforts to make you money." (1:04-CR-165, Dkt. No. 521, at 3591-92.) Thus, her jury instruction claims lack merit.

### Q. Ground Twenty-One: Argument (4)

Marcusse claims that the government violated her due process rights when the government allegedly falsely contended that the *Klein* conspiracy charge set forth in Count 42 included a "failure to file a tax return" allegation, and this Court proceeded to include as part of the instructions on the charge that the filing of a tax return is not voluntary. (Dkt. No. 34, at 242-45.)    Liberally construed, it appears that Marcusse claims a constructive amendment of the indictment or fatal variance occurred.

However, no constructive amendment of the indictment occurred through the jury instructions because the instructions correctly recited the elements of a *Klein* conspiracy to defraud the United States, as was charged in Count 42 pursuant to 18 U.S.C. § 371.  (1:04-CR-165, Dkt. No. 522, at 3770-71); *see also, e.g., United States v. Brandon*, 17 F.3d 409, 428 (1st Cir. 1994) (setting forth elements of a § 371 conspiracy to frustrate the functions of the IRS, also known as a *Klein* conspiracy).   This Court did not instruct the jury that they could return a guilty verdict on Count 42 merely on a finding that Marcusse failed to file a tax return.   Nor did the Court even instruct the jury that it had to find Marcusse failed to file a return.   Rather, this Court correctly instructed on background law that "the filing of a return is not voluntary;" that is, a person cannot simply choose to not file a return when the person has gross income over a certain amount.   (1:04-CR-165, Dkt. No. 522, at 3772.)   Where, as here, there is virtually no chance that the jury could have convicted Marcusse of any offense other than that for which she was charged, there has not been a constructive amendment.   *See*

*United States v. Chilingirian*, 280 F.3d 704, 712 (6th Cir. 2002).

Nor was there a fatal variance. A variance occurs when the charging terms of the indictment are left unaltered but the evidence offered at trial proves materially different from those alleged in the indictment. *United States v. Mahar*, 801 F.2d 1477, 1503 (6th Cir. 1986). Variances, even on direct review, will not result in reversal unless the "substantial rights" of the defendant have been affected. *United States v. Hathaway*, 798 F.2d 902, 911 (6th Cir. 1986). Substantial rights are affected only when a defendant proves prejudice to his ability to defend himself, to the overall fairness of the trial, or to the indictment's sufficiency to bar subsequent prosecutions. *Id.* Finally, the burden of proof rests upon the defendant to prove that the variance is fatal. *United States v. Miller*, 471 U.S. 130, 138 n.5 (1985).

Here the government's proof at trial was consistent with the allegations in the indictment: that Marcusse conspired to "defeat the lawful functions of the Internal Revenue Service . . . in the collection of revenue" by engaging in such acts or omissions as "fail[ing] to report to the [IRS] the salaries and commissions they paid themselves," "fail[ing] to report . . . the monies . . . received . . . with which they paid personal expenses" and conducting transactions in a manner "so as to hide" funds "for the purpose of evading the payment of appropriate income taxes." (*See* 1:04-CR-165, Dkt. No. 108, at 26.)

As for Marcusse or her coconspirators failing to file tax returns, even if such acts or omissions were not fairly subsumed within these express terms of Count 42, "[i]t is axiomatic

that all the overt acts in furtherance of a conspiracy need not be alleged in the indictment."

*United States v. Henson*, 848 F.2d 1374, 1385 (6th Cir. 1988). Indeed, the failure to file tax returns more than qualifies as a sufficient "overt act" in furtherance of a *Klein* conspiracy to frustrate or defeat the function of the IRS where, as it was argued and proved here, the act or omission was for the purpose of and part of a broader scheme to defeat the lawful functions of the IRS by dishonest means, executed in conjunction with a money laundering operation, in which honest filings with the IRS might have disclosed the mail fraud (Ponzi) scheme the laundering was intended to hide. *Cf. United States v. Williams*, 649 F.Supp. 1290, 1293-96 (M.D. Fla. 1986) (finding that failure to report income was part of larger scheme to evade taxes and avoid detection of profit skimming scheme) (citing *United States v. Enstam*, 622 F.2d 857 (5th Cir. 1980)). *See also United States v. Shermetaro*, 625 F.2d 104 (6th Cir. 1980) (finding a *Klein* conspiracy to frustrate IRS as part of effort to conceal Medicare kickback scheme). In light of the broad "failure to disclose" allegations in Count 42 and the related money laundering and mail fraud conduct specifically incorporated by reference into that Count, Marcusse cannot demonstrate prejudice to a substantial right warranting collateral relief.

### R. Ground Twenty-Two: Argument (1)

Marcusse alleges the circumstances surrounding her pre-sentence report ("PSR") violated her right to Due Process. (Dkt. No. 34, at 245-48.) Specifically, Marcusse argues that the PSR was unreliable because it was not based on trial testimony (*id.* at 246), and that

she was unable to make written objections to the PSR because her legal papers were confiscated by jail officials (*id.* at 246-47).  Marcusse's factual assertions are not supported by the record, and her legal arguments lack merit.

Marcusse correctly asserts that under Rule 32, a district court must rule on disputed portions of the PSR.  The Sixth Circuit requires "literal compliance" with Rule 32.  *United States v. Poulsen*, Nos. 08–4218, 09–3658, 2011 WL 3715115, at *15 (6th Cir. Aug. 25, 2011).  "The court may not blindly accept the PSR, but '[w]hen a defendant fails to produce any evidence to contradict the facts set forth in the PSR, a district court is entitled to rely on those facts when sentencing the defendant.'"  *Id.* (quoting *United States v. Geerken*, 506 F.3d 461, 467 (6th Cir. 2001)).  The government's burden is triggered when the defendant "produce[s] some evidence that calls the reliability or correctness of the alleged facts into question" that is more than a "bare denial."  *United States v. Lang*, 333 F.3d 678, 681 (6th Cir. 2003).  Further, although district courts must be in 'literal compliance' with the requirements of Rule 32, violations nonetheless are reviewed for harmless error.  *United States v. Roberge*, 565 F.3d 1005, 1011 (6th Cir. 2009).  In the context of a § 2255 motion, therefore, a defendant would have to show that the alleged error had a "substantial and injurious effect" on the outcome of the sentencing proceeding.  *Griffin v. United States*, 330 F.3d 733, 736 (6th Cir. 2003) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

In this case, the Court did not commit any error under Rule 32, let alone one that had a substantial and injurious effect on the outcome of Marcusse's sentencing proceedings.

Marcusse's standby counsel, the probation officer, and this Court gave Marcusse multiple opportunities to object in writing or verbally to the PSR, and she chose not to make a single specific objection. When served with a copy of the initial PSR, Marcusse filed a notice stating: "I, Janet Mavis Marcusse [a/k/a JANET MAVIS MARCUSSE] living woman over the age of 21 years do hereby provide notice that I take exception to the above referenced PSI in its entirety as not applicable to the substance of the 'matter' yet to be 'adjudicated' by a court of competent jurisdiction." (1:04-CR-165, Dkt. No. 483.) The probation officer received a copy of this document, and met with Marcusse and standby counsel to discuss it. (PSR Addendum at 1.) Marcusse "reported she had nothing further to say about this matter." (*Id.*) Thereafter, she acknowledged receipt of the final version of the PSR by filing another "notice," which stated: "Today I received your revised offer in regards to the above referenced case and PSI REPORT and hereby refuse it for fraud thereby rejecting your offer to contract." (1:04-CR-165, Dkt. No. 497.) Thereafter, she complained that her papers had been "stolen." (1:04-CR-165, Dkt. No. 509.)

Nothing in the record supports Marcusse's assertion that her papers were "stolen." It is unclear whether there is any basis for Marcusse's assertion that she did not have access to her legal materials prior to the sentencing hearing, let alone that there was any intentional effort to keep her from her materials. During the entire presentence investigation process—the time in which objections are to be made—she did not complain about lack of access to her legal papers, but instead chose to lodge a general objection to the entire PSR,

and refused to discuss it with the probation officer.   Further, Marcusse's standby counsel affirmed at the sentencing hearing that he had given her a copy of the PSR and the amended PSR, even though the probation officer had already provided it to her.  (1:04-CR-165, Dkt. No. 639, at 5.)  And he stated further:

> I did meet with her on numerous occasions and I did ask her whether she wished me to make objections on or even speak on her behalf at sentencing, and she's made it very clear to me that she does not wish me to speak on her behalf and that she does wish to speak on her own behalf and raise any objections that she has. I've indicated to her early on that she should make them well in advance of the sentencing hearing so that they could be viewed by both the government and by Your Honor.

(*Id.* at 5-6.)

Thereafter, Marcusse was given ample time to place on the record any and all objections she had.  Instead, she used the opportunity to engage in a diatribe against the government and the Court, contending that her entire prosecution was the result of a fraud perpetrated by the Department of Justice, with aid of the Court.  (*See, e.g., id.* at 26-27.)  She complained generally that she had not had sufficient access to her legal files to "prepare properly" but she did not identify what she needed in order to articulate her disagreements with the PSR.  (*Id.* at 27.)  She chose to make general objections to the entire report, occasionally listing paragraphs, but not stating the nature of the objection and ultimately circling back to "basically all of it."  (*Id.* at 27, 28.)  These "general" objections—which all go to the legitimacy of her conviction, not to any factual assertions in the PSR that affect her sentence—are insufficient to trigger Rule 32's requirement that "disputed" issues be ruled

54

upon.  Further, Marcusse's challenges cannot be construed as anything other than, at most, a "bare denial" of the report's contents, which is insufficient to controvert them.  *United States v. Lang*, 333 F.3d 678, 681 (6th Cir. 2003).  Even so, the Court did address Marcusse's general allegations of fraud, noting, "The jury has spoken in this matter." (1:04-CR-165, Dkt. No. 639, at 29.)

In any event, Marcusse has had access to all her legal materials for many years now, and has made frequent reference to them in the many pleadings that she has filed in the appellate court and the district court, and yet she fails to identify a single objection that, if she had adequately made it at sentencing, would have made a difference in her sentencing proceeding.  Accordingly, any conceivable error in the Court's resolution of her general, overarching objections to the PSR is harmless and she is not entitled to collateral relief.

### S. Ground Twenty-Three: Argument (1)

Marcusse contends that this Court violated her due process rights by instructing the jury on "honest services fraud" and using the term "specialized high return investments" at her sentencing.  (Dkt. No. 34, at 250-52.)  Because she did not contemporaneously object to either action by this Court, she procedurally defaulted these arguments and must demonstrate "cause" and "actual prejudice" excusing the default.  Because she fails to do so, this claim is dismissed.

Even if the arguments were not defaulted, they would not warrant collateral relief. When this Court used the term "honest services fraud," it did so in the context of explaining

55

to the jury the difference between tangible and intangible rights. (1:04-CR-165, Dkt. No. 522, at 3757.) This Court correctly identified "honest services" as a type of intangible right. (*Id.*) However, this Court never instructed the jury that the government's theory of the case against Marcusse was that she engaged in a scheme to defraud anyone of "honest services" or any other intangible right. Indeed, as Marcusse complains in her pleadings, the government presented a theory of guilt and proof at trial that she schemed to deprive victims of their tangible property: their money. (1:04-CR-165, Dkt. No. 521, at 3503, 3511-17.) After all, the government charged mail fraud only under 18 U.S.C. § 1341 without referencing or citing an "honest services" theory under 18 U.S.C. § 1346. Because the jury was not asked by the government to convict Marcusse on an intangible rights or "honest services" theory and this Court did not actually instruct them to review the evidence under such a theory, this Court's explanation could not have rendered her trial fundamentally unfair. *See McGuire*, 502 U.S. at 72.

Marcusse nevertheless notes in passing that an "honest services" fraud case was pending before the Supreme Court at the time she filed her petition for collateral relief last year. Indeed, the Supreme Court held in that case that, in order to avoid unconstitutional vagueness problems, the only "honest services fraud" theories that may be charged under § 1346 are bribery and kickback schemes. *Skilling v. United States*, 130 S. Ct. 2896 (2010). However, the *Skilling* Court was concerned with vague corruption theories charged under § 1346 and specifically distinguished as unproblematic those mail frauds charged only under

§ 1341 where, as in Marcusse's case, "the victim's loss of money or property supplied the defendant's gain." *Id.* at 2926.

As for this Court's use of the term "specialized high return investments" at Marcusse's sentencing, Marcusse again fails to show grounds for collateral relief. Marcusse complains that this phrase was not used at trial by the government and, therefore, this Court must have sentenced her on the basis of some crime for which she was not convicted. This Court, however, was not employing some sort of term of art for a particular crime under the criminal code. Rather, this Court simply and accurately described in lay terms the same scheme that the government described as involving alleged "high return" "investment vehicles" earning "three to ten percent a month" (1:04-CR-165, Dkt. No. 470, at 42) or "high yield investment program[s]" (1:04-CR-165, Dkt. No. 521, at 3515), such as the "eight percent program" (*id.* at 3513, 3238), which were allegedly "backed by the federal reserve" and yet "'non-taxed'" (*id.* at 3514). Marcusse herself described what she sold as "private placement" "programs" (1:04-CR-165, Dkt. No. 518, at 3029) that earned as much as "eight" (*id.* at 3238) or "ten or eleven percent" (*id.* at 3022) and even paid "tax-free gifts" to investors. (1:04-CR-165, Dkt. No. 520, at 3398).

### T. Ground Twenty-Three: Arguments (3), (7), (8)

Marcusse asserts three arguments challenging the Court's restitution order. In her third argument, Marcusse complains that "the amount claimed as losses by investors and for restitution at sentencing is substantially in error." (Dkt. No. 34, at 254.) Marcusse's seventh

argument claims that the judgment order requiring $1,000 per month restitution payments upon her release is "utterly unreasonable." (*Id.* at 266.)  In her eighth argument, Marcusse claims that "it is unlikely that any of the IRS restitution can be proven to be legitimate." (*Id.* 268.)  None of these claims is cognizable in a § 2255 motion.

Relief under 28 U.S.C. § 2255 is available only for prisoners "claiming the right to be released." 28 U.S.C. § 2255 (2006).  A challenge to an order of costs or restitution is not a claim of the right to be released.  Thus, challenges to fines, restitution, and other financial penalties are not cognizable under § 2255.  *See United States v. Watroba*, 56 F.3d 28, 29 (6th Cir. 1995).  The Sixth Circuit has plainly stated: "[a] challenge to a restitution order is not cognizable in a motion to vacate under § 2255." *United States v. Washington*, 172 F.3d 50, 1998 WL 898878, *2 (6th Cir. 1998).

Although the Sixth Circuit permits a defendant to challenge a restitution order on collateral review if it is related to a claim of ineffective assistance of counsel, *Ratliff v. United States*, 999 F.2d 1023, 1026 (6th Cir. 1993), that exception is not available to Marcusse because she does not frame her restitution claims as premised upon ineffective assistance of counsel, and second, she represented herself at sentencing.  "A defendant who elects to represent himself cannot thereafter complain that the quality of his own defense amounted to a denial of effective assistance of counsel." *Wilson*, 515 F.3d at 696 (quoting *Faretta*, 422 U.S. at 834 n.46).

In any event, Marcusse's restitution claims lack merit.  She claims that Special Agent

58

Flink of the FBI "made up the $20.7 million [loss] figure and then refused to produce his 'list'" that itemized specific investors and their losses.  (Dkt. No. 34, at 254.)  But the record shows that Agent Flink testified in detail as to how he arrived at the $20.7 million figure, explaining that there were "thousands of deposits," all contained in the trial exhibits.  (1:04-CR-165, Dkt. No. 513, at 2038-40.)

### U. Ground Twenty-Three: Argument (4)

Marcusse argues that her sentence was unconstitutionally disproportionate compared to other similar cases.  (Dkt. No. 34, at 255-57.)  Outside of extraordinary circumstances, claims of nonconstitutional error in sentencing cannot be raised in a § 2255 motion.  *United States v. McArthur*, 2011 WL 2144436, at *1 (E.D. Mich. May 31, 2011).  "'The mere fact that the plaintiff's sentence is greater than that of his co-defendant does not warrant relief under § 2255.'"  *Id.* (quoting *Kessel v. United States*, 785 F.2d 309, 1986 WL 16448, at * 1 (6th Cir. Jan. 16, 1986)).  "'There is no violation of a constitutional right because the United States Constitution contains no strict proportionality guarantee . . . Furthermore, the mere disparity of a sentence even among codefendants does not in and of itself suggest that one defendant has been arbitrarily singled out for a more severe punishment than that normally imposed upon similarly situated defendants.'"  *Id.* (quoting *Terry v. Tripplett*, 62 F.3d 1418, 1995 WL 469424, at *1 (6th Cir. Aug. 7, 1990)).  A defendant who complains that her sentence is disproportionately severe compared to sentences received by others is not entitled to collateral relief; "[w]hen the sentence is within the statutory limits, a defendant cannot

collaterally attack its severity." *United States v. Burns*, F. Supp. 1988 WL 122735, at *6 (E.D. Ky. October 14, 1988) (citing *Orr v. United States*, 408 F.2d 1011 (6th Cir. 1969)).

Thus, because Marcusse does not have a constitutional right to the same sentence as other defendants, and because her sentence was within statutory limitations, her claim of sentencing disparity lacks merit.

### V. Ground Twenty-Three: Argument (5)

Marcusse argues that the Court violated the Ex Post Facto Clause by not applying the 2000 Sentencing Guidelines to her case, apparently on the ground that the charged substantive counts of mail fraud and money laundering occurred before the enactment of the 2001 Sentencing Guidelines. (Dkt. No. 34, at 259.) That argument lacks merit because the charged offenses of conspiracy did not terminate until 2004.

Preliminarily, the claim is procedurally defaulted. Marcusse represented herself at sentencing. Although she objected to paragraph 195 of the PSR (stating that the 2004 Sentencing Guidelines were to be applied), her objection was general, consisting primarily of the phrase "zero points, zero sentence." (Dkt. No. 639, at 28.) Such overly general objections do not suffice to preserve an objection. *Miller v. Currie*, 50 F.3d 373, 380 (6th Cir. 1991). Marcusse raised the objection in her pro se direct appellate brief, but her failure to raise it in the district court nonetheless results in procedural default. *See United States v. Barajas-Diaz*, 313 F.3d 1242, 1245 (10th Cir. 2002).

In any event, the claim lacks merit. The Court used the November 1, 2004, edition

60

of the Guidelines to determine Marcusse's advisory guideline range during sentencing, in accordance with USSG § 1B1.11(a), which directs that the Guideline Manual in effect at the time of sentencing is to be used, unless there are ex post facto concerns.  Marcusse was convicted of three conspiracy counts: Count 40 (conspiracy to commit mail fraud); Count 41 (conspiracy to commit money laundering); and Count 42 (conspiracy to defraud the United States).  Each of these counts charged a continuing offense from January 1998 to October 27, 2004.  Under USSG § 1B1.11, comment. n.2, in the case of a continuing offense, the last date of the continuing offense is controlling for ex post facto purposes.  Here, the last date of Marcusse's conspiracy convictions was October 27, 2004.  The crime thus "straddled" the 1998 and 2003 editions of the Sentencing Guidelines.

The Sixth Circuit has routinely held that, for ex post facto purposes, the most recent version of the Guidelines applies to straddling crimes.  *See, e.g. United States v. Green*, 242 F. App'x 343, 348 (6th Cir. 2007); *United States v. Barger*, 931 F.2d 359, 365 (6th Cir. 1991); *United States v. Edgecomb*, 910 F.2d 1309, 1311 (6th Cir. 1990).  As the last date of the conspiracy counts was October 27, 2004, the November 1, 2003, Guidelines Manual might apply if that manual was more beneficial to Marcusse.  As the Probation Office noted in connection with other defendants who made similar arguments concerning the use of the November 1, 2004, Guidelines Manual, however, no difference in scoring would result if the November 1, 2003, Guideline Manual were used.  (*See, e.g.*, Wesley Boss PSR Addendum at 1-2.)  Thus, the Court properly used the 2004 Guidelines.

61

The fact that some of the substantive mail fraud and money laundering acts occurred on earlier dates is irrelevant because the government proved that the conspiracies contemplated "continuity of purpose." *See United States v. Gardiner*, 463 F.3d 445, 463 (6th Cir. 2006). Therefore, the government was entitled to a presumption that the conspiracy continued and Marcusse remained a party unless and until she showed that the conspiracy terminated or she affirmatively withdrew. *See United States v. Goff*, 400 F. App'x 1, 25 (6th Cir. 2010). Here, as in *Goff*, Marcusse made no such showing. For sentencing purposes, the last date of commission is the date that the conspiracy ended, not the date of the last overt act in furtherance of the conspiracy. *Id.* at 26.

Moreover, although the November 1, 2000, Guidelines Manual might be more beneficial to Marcusse (she provides no calculation to that effect, but it appears that the guidelines governing financial crimes were substantially amended and made more stringent beginning in November 1, 2001), there is no difference between Marcusse's advisory guideline range using the November 1, 2001, Guidelines Manual, as compared to the November 1, 2004, manual that was used. There is no plausible argument that the conspiracy—or Marcusse's involvement in it—ended prior to November 1, 2001. Marcusse continued to send out newsletters, in November 2001, and beyond. (*See, e.g.*, 1:04-CR-165, Dkt. No. 471, at 152-53.) Even though the investors' funds were nearly depleted by the end of 2001, some investors continued to send in checks, which members of the conspiracy promptly cashed and diverted to their own use. (*See, e.g.*, 1:04-CR-165, Dkt. No. 476, at 1187-88.)

Marcusse also argues that the Court should have applied the November 1, 2000, Guidelines to Counts 1 to 39, which were separate, substantive offenses of mail fraud, all occurring before September 2001.  But courts must follow the "one book rule" – they may not apply separate guideline sections from different editions of the Guidelines manual. Instead, courts should apply the revised version of the Guidelines pertaining to the most recent offense.  *See Duane*, 533 F.3d at 449 (citing USSG § 1B1.11(b)).  Moreover, the substantive counts were grouped with the conspiracy counts.  When offenses are grouped together for sentencing purposes, application of the amended version of the Guidelines to the earlier offenses does not violate the ex post facto clause.  *United States v. Duane*, 533 F.3d 441, 449 (6th Cir. 2008).  The grouping rules provide sufficient notice to the defendant that revised guidelines may apply to substantially similar prior offenses.  Thus, any disadvantage based upon the newer guidelines results from the defendant's choice to commit further crimes, rather than from changes in law.  *Id.* at 448.

### W. Ground Twenty-Three: Argument (10)

Marcusse argues that certain FBI files were improperly withheld from her.  (Dkt. No. 34, at 273-77.)  Specifically, she argues that the government failed to turn over its "302s" (investigative reports) until February 5, 2010, and that had she had access to these reports at the time of her trial, she would have used them to establish that two of the agents who testified committed perjury.  This argument is meritless.

First, the government disclosed *Jencks* and *Brady* material, and FBI 302s before trial began.  Prior to the final pretrial conference, the government filed a motion agreeing that

prior to the trial, "the Government will provide a copy, in advance, of not only '*Jencks*'

material but also agency reports of interviews (FBI Form 302's and IRS Memorandum of

Interview 'MOI's') which have not been adopted or reviewed by the witness and are thus not

'*Jencks*' materials and not subject to disclosure. . . ." (1:04-CR-165, Dkt. No. 275, at 1.)

Citing a concern that "further copying or dissemination of these materials could endanger or

harass Government witnesses, chill future sources of information, and constitute unwarranted

disclosure of grand jury and Government information," the government requested that the

Court order that the early release of the materials be subject to the restriction that copies

distributed to pro se defendants be made in open court and remain at all times in the

courtroom.  (*Id.* at 2.)  The Court granted this request, but further required that standby

counsel be given access to the materials as well.  (1:04-CR-165, Dkt. No. 288.)

    At the final pretrial conference, the government stated that arrangements had been

made to implement this

> AUSA Gezon: We propose next week Wednesday [prior to the trial beginning the following Monday] to have available all the *Jencks*-related material for the defendants. They may pick it up Wednesday. The standby counsel have graciously agreed to hold the set of *Jencks* material for their respective defendants, pro se defendants, so that in honor of the Court's order that they have the *Jencks* material here in court, but they may not take it out of the courtroom, the standby counsel will keep it with them when we're not in session.

(1:04-CR-165, Dkt. No. 651, at 13.)  Attorney Kaczor reviewed all *Jencks* material prior to

the trial (Dkt. No. 60, ¶¶ KK.1; NN.2) and he cannot recall one single request regarding the

trial, trial procedure, or trial strategy made by Marcusse that he did not try to accomplish (*id.*

¶ OO.3).  There is no evidence to support the general assertion that pertinent investigative reports were withheld from Marcusse at the time of her trial.

Second, Marcusse has no viable *Brady* claim based on any of the supposedly withheld documents.  To establish a *Brady* violation, a defendant has the burden of showing that the government suppressed evidence, that such evidence was favorable to the defense, and that the suppressed evidence was material.  *United States v. Warshak*, 631 F.3d 266, 300 (6th Cir. 2010).  "[C]onclusory" or "purely speculative" allegations, however, cannot support a Brady claim.  *Murphy v. Johnson*, 205 F.3d 809, 814 (5th Cir. 2000).  Marcusse has not satisfied any of these burdens.  For example, she alleges that some of the FBI 302s "talk about MLC, dating from early 2002," which supposedly demonstrates that Agent Flink lied when he claimed that he did not know MLC was an investment.  Agent Flink, however, testified that money was paid to MLC, but that it was a different program, with different investors and he did not investigate it.  (1:04-CR-165, Dkt. No. 513, at 2057.)  The fact that people mentioned MLC in some of the FBI reports is of no consequence to anything.

The remaining arguments similarly relate to collateral or completely irrelevant matters and similarly lack merit.

## X. Ground Twenty-Five: Argument (1)

Marcusse claims that "[t]he courtroom was closed for the jury selection process, with a sign on the door stating, unless you were a witness or an investor, you could not attend due to the large crowd expected."  (Dkt. No. 34, at 281.)  Marcusse did not object to this alleged

limitation at trial; thus, it is procedurally defaulted.  Further, the claim is without merit.

There is no mention in the record of any sign or of the Court restricting attendance to witnesses or investors.  In fact, the record shows that the Court worked to improve public access to trial proceedings.  As this Court explained:

> I'm going to use my old courtroom down on the fourth floor as an overflow courtroom, and the camera that is above the exit sign in the back of the courtroom will in fact have a view of the entire courtroom except for the jury box, and that will be played into that fourth floor courtroom so that those who cannot sit here for some reason, either not enough room or they wish not to be in the courtroom, can sit on the fourth floor during this proceeding and can be able to see what's going on inside the courtroom by way of witnesses, testimony, arguments, et cetera, et cetera.

(Final Pretrial Conf. Tr. 8.)  Hence, the court did not try to exclude the public.  Rather, the court made extra arrangements to accommodate potential crowding.

A court does not violate a defendant's Sixth Amendment right to a public trial unless there is some "affirmative act by the trial court meant to exclude persons from the courtroom." *United States v. Al-Smadi*, 15 F.3d 153, 154 (10th Cir. 1994).  Here, there was no affirmative act of exclusion, for seating limitations alone do not create Sixth Amendment violations.  *See United States v. Shryock*, 342 F.3d 948, 974 (9th Cir. 2003); *United States v. Kobli*, 172 F.2d 919, 922 (3d Cir. 1949).  As the Supreme Court has stated, "the public trial guarantee is not violated if an individual member of the public cannot gain admittance to a courtroom because there are no available seats. The guarantee will already have been met, for the 'public' will be present in the form of those persons who did gain admission." *Estes v. State of Texas*, 381 U.S. 532, 589 (1965) (Harlan, J., concurring).

In this case, nothing in the record shows that any member of the public was in fact excluded, and nothing in the record shows that the Court did anything to affirmatively exclude the public. Moreover, even if overcrowding kept out certain members of the public, Marcusse's right to a public trial was not violated, for the reason explained by Justice Harlan in *Estes*. Thus, her claim is without merit.

### Y. Ground Twenty-Five: Argument (2)

The Sixth and Fourteenth Amendments protect the right of a criminal defendant to be present at proceedings related to his or her case. *United States v. Gagnon*, 470 U.S. 522, 526 (1985). Marcusse claims that the district court judge violated this right by communicating with jurors outside of her presence. (Dkt. No. 34, at 282.) This argument lacks merit because no improper ex parte communications occurred.

Marcusse points to two instances of ex parte communication. First, at one point during Marcusse's trial, the Court told the parties, "I spent a little time with the jury this morning. I gave them a little tour of my office and chit-chatted with them. I do this periodically on a long-term jury to get them – to kind of raise their spirits a little bit." (1:04-CR-165, Dkt. No. 478, at 1763.) Later, the Court informed the parties that it had spoken with the jurors about whether they were able to catch up on their civilian work responsibilities during a day-long break in the trial. (1:04-CR-165, Dkt. No. 513, at 2035.)

Marcusse did not object to these instances of ex parte communication at trial; therefore, the issue is procedurally defaulted. Marcusse has not shown cause and prejudice

to excuse the default.  In any event, the Court's communications were wholly proper.  "Not every 'ex parte conversation between a trial judge and a juror' violates the Constitution." *Johnson v. Bagley*, 544 F.3d 592, 596 (6th Cir. 2008) (quoting *United States v. Gagnon*, 470 U.S. 522, 526, (1985)).  Instead, "communications with a juror are presumptively prejudicial only when they concern 'a matter pending before the jury.'"  *Johnson v. Bagley*, 544 F.3d 592, 596 (6th Cir. 2008) (quoting *Remmer v. United States*, 347 U.S. 227, 229 (1954)).

Here, the ex parte communication related to an office tour and outside employment, not any matters pending before the jury.  Thus, there is no presumption of prejudice, and the Court did not violate Marcusse's right to personal presence.

### Z. Ground Twenty-Five: Argument (3)

Marcusse claims that "it was prejudicial error for Judge Bell to order an anonymous jury."  (Dkt. No. 34, at 282.)  She complains that a juror who "had the appearance of a federal government employee" spent most of the trial sleeping and became the jury's foreman.  (*Id.*)  Marcusse implies that the Court empaneled an anonymous jury in order to hide the identity of this undercover government agent.  (*Id.*)  Marcusse failed to object to the use of an anonymous jury, and therefore, this issue is procedurally defaulted.  It is also without merit.

The question of whether to empanel an anonymous jury is "within the sound discretion of the trial court."  *United States v. Lawson*, 535 F.3d 434, 439 (6th Cir. 2008) (quoting *United States v. Talley*, 164 F.3d 989, 1001 (6th Cir.1999)).  In fact, "there is no

constitutional right to a public jury." *Id.* A district court can empanel an anonymous jury

whenever the interests of justice so require. 28 U.S.C. § 1863(b)(7) (1992); *United States*

*v. Deitz*, 577 F.3d 672, 684 (6th Cir. 2009). Protecting the targets of a threat is in the

interests of justice. *See, e.g., Deitz*, 577 F.3d at 685.

The Court empaneled an anonymous jury because it had received a document of a

"semi-threatening nature." (Final Pretrial Conf. Tr. 4.) It did not do so to permit the

government to plant an agent on the jury. Thus, the Court exercised its lawful discretion in

response to a threat, in the interests of justice.

### AA. Ground Twenty-Six: Argument (1)

Marcusse argues that her appointed appellate counsel was constitutionally ineffective

because he allegedly made misstatements of fact in the brief he prepared on Marcusse's

behalf, and either did not advance the arguments she urged or advanced them in a way she

deems less effective than the way she would have presented them. (Dkt. No. 34, at 283-91.)

This argument lacks merit because Marcusse has failed to show that her appellate counsel's

performance was deficient and has also failed to show that she was prejudiced by that

performance.

A defendant claiming ineffective assistance of appellate counsel must satisfy the

*Strickland* standard by showing that (1) appellate counsel's performance fell below an

objective standard of reasonableness and that (2) there is a reasonable probability that, but

for the deficient performance, the outcome of the appeal would have been different.

*Strickland*, 466 U.S. at 694. In deciding whether appellate counsel was ineffective for failing to raise an allegedly meritorious issue on appeal, the court must assess the strength of the claim appellate counsel failed to raise. *McFarland v. Yukins*, 356 F.3d 688, 700 (6th Cir. 2004). As the Sixth Circuit highlighted in *McFarland*, "[c]ounsel's failure to raise an issue on appeal could only be ineffective assistance if there is a reasonable probability that inclusion of the issue would have changed the result of the appeal." *Id.* at 699.

Marcusse has shown neither deficient performance nor prejudice. Marcusse cites alleged factual errors in her counsel's recitation of the facts (Dkt. No. 34, at 283), but the alleged errors are not actually erroneous. First, counsel's brief does not say she was denied only three witnesses; rather, counsel focused for obvious strategic reasons on those witnesses because those were the only ones for which she specifically renewed her subpoena request. Second, Marcusse did admit to not filing returns because she considered her "compensation" from her investment activities to be "gifts." (1:04-CR-165, Dkt. No. 519, at 3169.) Third, the assertion that Marcusse testified that the Bahamas CD Program was expected to return $25 million on a $350,000 investment was perhaps awkwardly worded, but still accurate. All the evidence indicated the amount invested was approximately $350,000, even though Marcusse maintained that she put in $4.2 million. (*Id.* at 3213-14.) More importantly, none of these alleged misstatements had any effect on the outcome of the appellate proceeding.

Similarly, Marcusse's arguments concerning her appellate counsel's choice of arguments do not establish that counsel was ineffective. A criminal defendant does not have

a constitutional right to have appellate counsel raise every non-frivolous issue on appeal. *See Jones v. Barnes*, 463 U.S. 745,(1983). Strategic and tactical choices regarding which issues to pursue on appeal are "properly left to the sound professional judgment of counsel." *United States v. Perry*, 908 F.2d 56, 59 (6th Cir. 1990). In fact, "the hallmark of effective appellate advocacy" is the "process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail." *Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting *Barnes*, 463 U.S. at 751-52). "Generally, only when ignored issues are clearly stronger than those presented will the presumption of effective assistance of appellate counsel be overcome." *Monzo v. Edwards*, 281 F.3d 568, 579 (6th Cir. 2002). Appellate counsel may deliver deficient performance and prejudice a defendant by omitting a "dead-bang winner," which is defined as an issue which was obvious from the trial record and would have resulted in a reversal on appeal. *See Meade v. Lavigne*, 265 F. Supp. 2d 849, 870 (E.D. Mich. 2003).

Marcusse points to no such issues. The alleged *Bruton* issues were not "deadbang winners" because two out of the three statements Marcusse challenges (the letters to investors, one from the Bosses and the other from Buffin) were non-testimonial. *See United States v. Johnson*, 581 F.3d 320, 326 (6th Cir. 2009) ("Because it is premised on the Confrontation Clause, the *Bruton* rule, like the Confrontation Clause itself, does not apply to nontestimonial statements."). Buffin's statement to Agent Moore that at some point he realized that "this thing went bad" and that "Jan's good at dangling the carrot in front of your

71

face," while arguably testimonial, was not sufficiently prejudicial to withstand plain error review.  The other arguments that Marcusse claims should have been raised on appeal are all variations of arguments she makes in this motion, all of which lack merit and were therefore appropriately not raised by appellate counsel.

Appellate counsel consulted with Marcusse concerning the arguments to be raised on appeal (Dkt. No. 60, Attach. 1, ¶¶ 5, 6), and explained that he would not raise arguments that lacked any factual or legal basis (*id.* at ¶ 6).  In his affidavit, appellate counsel characterizes Marcusse's allegation that he colluded with the Sixth Circuit and the government against her as "absurd." (*Id.* at ¶ 12).  Thus, Marcusse's claims are without merit.

### BB. Ground Twenty-Seven: Argument (2)

Marcusse alleges that her legal research, papers, and trial records were improperly confiscated, and that the Court violated her constitutional right to access the courts.  (Dkt. No. 34, at 295.)  These arguments lack merit.

First, it is clear that Marcusse has had full access to the courts.  In November 2005, after Marcusse's sentencing, the Court issued an administrative order indicating that because Marcusse had "sent all manner of written communications to this Court's Clerk's office and various judicial officers, virtually all [of which] communications [were] lacking in any legal merit and [were] thus plainly designed to harass and intimidate the recipients," all communications from Marcusse would be submitted to a magistrate judge to determine whether it was a lawful pleading and therefore should be filed. (1:04-CR-165, Dkt. No. 601.)

72

This was a reasonable restriction, in light of Marcusse's pattern of filing vexatious papers.

The Sixth Circuit has issued an order stating that this Court's "designation [of Marcusse] as a restricted filer is justified." (Sixth Cir. No. 10-2627, 3/11/11 Order, at 2.) The court observed that a district court "has the inherent power 'to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants.'" (*Id.* (quoting *Landis v. N. Amer. Co.*, 299 U.S. 248, 254 (1936)).) Thus, "a district court may impose prefiling restrictions on a litigant with a history of repetitive or vexatious litigation." (*Id.* (citing *Feathers v. Chevron U.S.A., Inc.*, 141 F.3d 264, 269 (6th Cir. 1998); *Filipas v. Lemons*, 835 F.2d 1145, 1146 (6th Cir. 1987)).) Thus, the court concluded, Marcusse's status as a restricted filer was not a clear abuse of discretion and "has not prevented Marcusse from litigating her motion to vacate or improperly denied her access to the district court." *Id.*

For similar reasons, Marcusse's claim that her access to legal materials was restricted during some period of time while her appeal was pending lacks merit. Marcusse had sufficient access to materials to put together a 277-page brief, filled with record citations, and a substantial volume of additional "exhibits." Moreover, while Marcusse's accusation that prosecutors are responsible for "hav[ing] prison officials engage in such dirty tactics" (Dkt. No. 34, at 295) is unfounded, her failure to identify any prejudice from not having access to her legal materials for some period of time while her appeal was pending independently defeats her claim.

73

### CC. Ground Twenty-Eight: Argument (1)

Marcusse alleges the court of appeals acted improperly resulting in a violation of Due Process. (Dkt. No. 34, at 296-301.)  Marcusse also makes more allegations of collusion and ineffectiveness by her court appointed counsel, Melvin Houston.  (*Id.* at 298-99.)  These arguments lack merit.

Marcusse accuses the court of appeals of engaging in three acts of "fraud": (1) implying that it would consider her pro se arguments on appeal but not doing so; (2) attributing a brief quotation to her, rather than to defense counsel; and (3) claiming it had considered her pro se arguments when it had not done so.  (Dkt. No. 34, at 299.)  That the Sixth Circuit allowed her to submit a pro se brief and inquired at oral argument about other defendants wishing to adopt that brief (*id.*) does not prove that the court of appeals engaged in "fraud."  Although the Sixth Circuit occasionally permits the filing of pro se briefs in addition to briefs by that party's counsel, there is no constitutional right to such "hybrid representation" on appeal, and the general rule is that the appellate court does not consider such pro se briefs.  *See, e.g., United States v. Williams*, 641 F.3d 758, 770 (6th Cir. 2011) ("[B]ecause Williams was represented by counsel on this appeal, we decline to address these pro se arguments.") (citing *United States v. Martinez*, 588 F.3d 301, 328 (6th Cir. 2009)).

Thus, whether or not the court of appeals considered Marcusse's pro se arguments in her direct appeal, her constitutional rights were not violated.  That the court of appeals quoted from her counsel's brief and attributed it generally to her is of no moment — it is

typical for the court of appeals to refer to arguments made on behalf of a party (even those included in a brief by counsel) as that party's arguments or assertions.  And the statement — that defendants used some of the money invested to reward themselves — is wholly consistent with the position that Marcusse took at trial, that she considered investors' money to be non-taxable "gifts."  (1:04-CR-165, Dkt. No. 519, at 3169.)  Marcusse has shown no fraud by the court of appeals and no cognizable claim for collateral relief stemming from any of its conduct.

### DD. Ground Thirty: Argument (1)

Marcusse alleges that the cumulative effect of the errors she alleges amount to a violation of her right to Due Process.  (Dkt. No. 34, at 303.)  This argument lacks merit. Marcusse is able to benefit from a change in the law (*Santos*), but she has established no other constitutional errors.  Although trial-level errors that would be considered harmless when viewed in isolation of each other might, when considered cumulatively, require reversal of a conviction, *see, e.g., United States v. Parker*, 997 F.2d 219, 221 (6th Cir. 1993), "the accumulation of non-errors cannot collectively amount to a violation of due process." *Campbell v. United States*, 364 F.3d 727, 735 (6th Cir. 2004) (quoting *McKinnon v. Ohio*, No. 94-4256, 1995 WL 570918, at *12 (6th Cir. Sept. 27, 1995)).

### III.

Many of Movant's claims were not raised on appeal and are thus procedurally defaulted.  Additionally, all of Movant's claims lack merit, except the *Santos* claim, which

75

was procedurally defaulted. Even if the *Santos* claim was not considered procedurally defaulted, it only entitles Movant to collateral relief on Counts 43-57. However, the Court has discretion to decline to hear a substantive challenge to a conviction when the sentence on the challenged conviction is being served concurrently with an equal or longer sentence on a valid conviction. Because that is the case here, in the absence of procedural default, the Court would exercise its discretion to decline to hear the *Santos* claim. Thus, because Movant has not established that she is entitled to relief, her § 2255 motion will be denied.

Movant has also filed the following motions in this matter: (1) "Motion for Leave to Proceed in Forma Pauperis" (Dkt. No. 7); (2) "Motion for Leave to File Supplement to Ground Seven of the Motion to Vacate Regarding the Pervasive Bias of the Trial Judge" (Dkt. No. 30); (3) "Motion to Disqualify Judge Robert Holmes Bell" (Dkt. No. 32); (4) "Motion for Amended Findings & Objections to Order Denying Motions to File Supplemental Briefs in this § 2255 Proceeding" (Dkt. No. 38); (5) "Motion to Vacate Memorandum Opinions and Orders Dated March 8, 2011, and March 10, 2011, for Fraud and Bias" (Dkt. No. 40); (6) "Motion for Amended or Additional Findings, to Alter or Amend Judgment, and to Vacate the March 30, 2011 Opinion/Order" (Dkt. No. 43); (7) "Motion for Court to Take Judicial Notice of IRS Office of Chief Counsel's Court Documents Requesting Settlement of All Tax Litigation in Petitioner's Favor and Corresponding Judgment so Ordering by U.S. Tax Court; Motion to Expand Record" (Dkt. No. 71); and (8) "Motion for Order to Produce the Docket for Civil Case No. 2002V00301 & for the Office of U.S.

Attorney to Cease and Desist from Purging, Destroying, or Otherwise Divesting Itself of Files or Documents in Any Case, Civil or Criminal, Related to Criminal Case No. 1:04-cr-165" (Dkt. No. 76).  All of these motions lack merit, and all will be denied.

Pursuant to 28 U.S.C. § 2253(c), the Court must also assess whether to issue a certificate of appealability to Movant.  To warrant a grant of a certificate of appealability, Movant "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  The Sixth Circuit Court of Appeals has disapproved of the issuance of blanket denials of a certificate of appealability.  *Murphy v. Ohio*, 263 F.3d 466, 467 (6th Cir. 2001). Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted.  *Id.*  Upon review of each claim, the Court does not believe that reasonable jurists would find its assessment of Movant's claims to be debatable or wrong. Accordingly, a certificate of appealability will be denied as to each claim.

An order will be entered consistent with this opinion.

Dated: <u>October 26, 2012</u>                    <u>/s/ Robert Holmes Bell</u>
                                                      ROBERT HOLMES BELL
                                                      UNITED STATES DISTRICT JUDGE